No. 2--06--1212    Filed: 1-26-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06--CF--280 |
| FRANK J. HOWARD, | ) ) ) | Honorable Charles R. Hartman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BURKE delivered the opinion of the court:

Defendant, Frank J. Howard, appeals his conviction of delivery of more than 15 but less than 100 grams of a substance containing cocaine. 720 ILCS 570/401(a)(2)(A) (West 2006). He asserts that the State did not show an adequate chain of custody for the cocaine and that the evidence was thus inadequate to convict him. We agree that the chain of custody was insufficient, so that the admission of the associated evidence was error. Defendant is entitled to a reversal of his conviction and to a new trial. We note that double jeopardy principles do not bar retrial.

The State charged defendant with the offense of which he has now been convicted. Defendant opted for a jury trial. The State's first witness was Monroe, Wisconsin, police officer Steven E. Gately, who was then assigned to the State Line Area Narcotics Team (SLANT). Gately identified defendant as someone known to him as "Nubs." On June 26, 2006, Gately called Nubs and asked to buy two ounces of cocaine. Nubs said that he could sell two ounces of cocaine in

powder form for $1,800. Gately agreed to the price, and Nubs told him that they could meet at "the usual spot"-- the 100 block of Adelbert Street in Freeport. Gately parked his vehicle and stayed in it until he saw Nubs emerge from an alley. Nubs motioned for Gately to approach, and the two walked back into the alley. Nubs then reached into his pocket and removed a baggie that contained a white powder. Gately weighed the baggie and contents with a small scale that he had carried in his pocket. The weight was 53 grams (that is, 1.9 ounces). Gately told Nubs that he had only $1,750 with him. Nubs said that that was acceptable, so Gately gave Nubs the money.

Gately put the baggie in his pocket, returned to his car, and drove to a preset location to meet five other officers. Gately reweighed the cocaine, again getting a reading of 53 grams. Gately stated that he "and Master Sergeant [Harry] Wellbank[] of the Illinois State Police properly packaged it as evidence."

The State showed Gately the cocaine exhibit. Gately identified it, saying that "[i]t is in a different bag that the crime lab put it in[,] but my initials are on the back of the bag, and my documentation on the front[;] this is the cocaine purchased from Nubs." The State asked Gately about other writing on a preprinted area of the evidence bag:

"Q. When you--on this it has a form that you fill out, is that right?

A. That is correct.

Q. And an evidence ticket so to speak?

A. Yes.

Q. And who filled that out?

A. The chain of custody was filled out from me, Gately, nine seven seven nine, which is my ID number and immediately after packaging it I turned it over to Master Sergeant Wellbank[], Wellbank[] two nine nine eight on six twenty-six 06[.]

Q. And you put that--you wrote your name in it and Wellbank[] and the date?

A. That is correct.

Q. Now is there a top portion of that that indicates certain other facts about it, did you fill that in also?

A. That is correct.

Q. Now when you gave it to Officer Wellbank or Master Sergeant Wellbank was that--until today was that the last time you had dealt with that?

A. That is correct.

* * *

Q. The way you can identify that is by your initials and the fact that you logged in your delivery to Wellbank?

A. Yes."

On cross-examination, Gately further elaborated on what he wrote on the bag:

"Q. [O]n the front of this, this is the actual evidence that you received as a result of purchasing it from this defendant, right?

A. That is correct.

Q. And you make the entries on here on this bag at or about the time that the sale was made and your purchase was made?

A. That is correct. Immediately packaged.

Q. And you filled out the top of it, is that correct?

A. That is correct.

Q. And all that information is accurate there?

A. That is correct."

Examining the exhibit at trial, Gately described the baggie's contents as having "some lumps." He further explained that the evidence bag containing the baggie had been secured with "evidence stick[-]glue." He said that he could tell from looking at the bag that the only other time it had been opened was in the crime lab, where it had been opened in a different place and then resealed the opening with evidence tape bearing someone's initials. Gately said that from June 26, 2006, to the trial, which started on October 23, 2006, he had worked on a total of 10 or 15 cases. He also said that a purchase of 53 grams was "one of the higher purchases for the Freeport area."

Master Sergeant Wellbank testified that, on June 26, 2006, he was involved in the surveillance of Adelbert Street. He saw defendant leaving the area of the transaction. After the transaction, Wellbank met with Gately. Gately handed him a "packet of white powder that he said he had just purchased." They reweighed the packet and its contents with Gately's portable scale, and they field-tested the contents; the result was consistent with the presence of cocaine. Wellbank remembered the baggie as "a regular sandwich type bag," but he was uncertain about that. He commented that Gately's portable scale was "not terribly accurate."

Asked if he recognized the "large outer bag," Wellbank said that he did "because *** my initials are on it and Gately's initials are on it and the date is on it and I.D. number." He did not explain what he meant by the "I.D. number," whether he was referring to a badge number or another

identifier. Wellbank explained that he had written "HW2998" on the bag's seal; the practice was to initial the bag over the seal to make the seal more tamper-resistant.

An interchange between the State and Wellbank clarified that the "chain of custody form" was not a paper form, but an area on the evidence bag. Wellbank said that, in that area, Gately's name appeared first, followed by his own. He also confirmed that Gately filled out the "top" portion of the bag.

After meeting with Gately, Wellbank took the evidence to an office in Monroe and placed it in the evidence vault, a vault to which only he had the combination. On June 28, in the early morning, he removed the evidence from the vault and took it to Rockford, intending to deliver it to the state police crime lab. He noted this removal on the chain-of-custody form. The lab was not open when Wellbank expected it to be, so Wellbank dropped the evidence in the State Police District 16 drop box. Wellbank crossed off "lab" as the destination shown on the chain-of-custody form. He explained that the "drop box" is actually a chute that goes to the district's evidence vault; it is in the same building as the lab, but the lab is on the fourth floor and the drop box or the vault is on the first floor. Three people had access to the District 16 vault: two alternate custodians, one of whom was Wellbank, and the primary custodian, Trooper Renaldo. Renaldo initialed the chain-of-custody form on July 3 or 5, 2006 (Wellbank could not clearly read the entry); Wellbank believed that this was when Renaldo logged the evidence in. Logging in, Wellbank explained, means checking the contents of the vault and entering items into the computer. The State asked Wellbank whether "seven five" was "the next date after June 28" on the form, and Wellbank said no. The State did not seek further information about this apparent other handling of the evidence. Wellbank later transferred the evidence to Officer Thomas Madigan of the Freeport police.

When Wellbank examined the exhibit in the courtroom, he said that the original seal on the evidence bag was intact. He noticed the addition of blue tape to the bag and said that it looked like what the Rockford crime lab would use.

Madigan testified that he had participated in the Adelbert surveillance. He watched Gately arrive at the spot set with defendant for the purchase. He saw Gately park and defendant walk out toward him. He then saw Gately join defendant and walk into an alley. After 30 to 45 seconds, Madigan saw Gately come out of the alley and get into his vehicle.

Madigan recognized the cocaine exhibit because it had the exhibit number of the evidence he took to the lab on October 3. He said that his initials appeared on the chain-of-custody form because he picked up the evidence from Wellbank at the Zone 2 investigations office and delivered it to Martin Skelcy, a forensic chemist with the state police crime lab in Rockford. On October 18, Madigan collected the evidence from the lab and took it to the SLANT evidence locker at the Freeport police department. Asked to compare how the exhibit looked on October 3 with how it looked as he examined it in the courtroom, he said that he noticed the addition of blue tape and that the powder was in a different bag. Under cross-examination, he testified that his police report said that "[o]n July fifth Arty Wellbank transferred Exhibit 6 to Illinois State Police vault" in Rockford; he did not report that Wellbank took the evidence to Monroe.

Skelcy testified that, when he received evidence from a police agency, he would put the package into his vault--he had a vault assigned to him exclusively for his cases--until he could test it. After he tested evidence, he would seal the package and place it back into his vault until someone from the agency came to get it. Only he could get into the vault on his own; if he were gone, another chemist and a manager together could open it.

Skelcy said that Madigan had personally delivered to him an evidence package on October 3, 2006. The package was an evidence bag that had inside it "a hand tied plastic [sic] that contained white powder." He recognized the cocaine exhibit as the package he received from Madigan on October 3:

> "Yes, I do [recognize it]. I recognize a sticker that was placed on the evidence. That sticker includes the--basically it says Illinois State Police. It includes the laboratory case number, laboratory exhibit number, the date that it was brought into the laboratory, and I recognize my initials that were written on that sticker right there and I also recognize the piece of blue evidence tape. This piece of blue evidence tape contains my markings which includes the laboratory case number, laboratory exhibit number, again my initials and the date that I sealed that evidence."

Examining the evidence bag in the courtroom, he said it looked the same as when it left his vault except for the addition of the State's exhibit sticker.

Skelcy analyzed the evidence the same day he received it. He opened the evidence bag, then opened the baggie inside, untying it and weighing the contents. The unpackaged powder weighed 51.2 grams. He then analyzed a sample of the powder and found that it contained cocaine. When he finished testing, Skelcy placed "it"--apparently, the loose powder and the original baggie--in a "ziplock bag." He marked the new bag with "my markings which includes laboratory exhibit number, laboratory case number and my initials and the date that I sealed it." He heat-sealed the new bag, then placed it into the evidence bag. He sealed that bag with blue evidence tape, marked the tape, and placed the bag into his vault. On October 18, 2006, he gave the bag back to Madigan.

The cross-examination brought out a degree of uncertainty about whether the original small bag in which defendant delivered the powder was still inside the new bag added by Skelcy; Skelcy admitted that he could not feel the original bag through the packaging, but he expressed certainty that it was there. At no time did Skelcy explicitly testify that the evidence bag was sealed when he received it. However, in describing lab procedure, he said that an "agency will bring in evidence[;] we will accept that evidence so long as it is in a sealed condition." He noted that he did not record information on the police chain-of-custody forms.

At the end of testimony on the first day, defense counsel told the State and court that he believed that the chain of custody was deficient. The State immediately moved for the admission of the cocaine exhibit. Defendant argued that Renaldo's testimony would be necessary to establish a proper chain of custody, because he was a custodian of the evidence. Defendant pointed to the inconsistency between Madigan's report of where the evidence went on July 5 and Wellbank's testimony. He argued that Wellbank's testimony was unclear about whether the drop box was on the first or fourth floor of the Rockford building. The court cut off defendant's argument, ruling that the evidence had traveled sealed from Freeport to Monroe and from Monroe to Rockford and that Skelcy had testified to it arriving sealed at the lab. The court suggested that Renaldo had moved the bag from the District 16 vault to the Zone 2 vault, but it found that the bag had not been opened during that time. Because the court found that the State had reasonably established that no one opened the evidence bag before Skelcy, it ruled that the State had presented a sufficient chain of custody.

The next day, Joshua Jerry, a Lafayette County (Wisconsin) sheriff's deputy on assignment to SLANT, testified to participating in the surveillance of the transaction, as a "rescue officer." Christopher H. Butcher, a Green County (Wisconsin) sheriff's deputy also on assignment to SLANT,

testified to seeing defendant with Gately at the transaction site. Michael Lehman, an Illinois State Police sergeant assigned to SLANT, testified that SLANT typically did not arrest a drug dealer immediately after a purchase; this was to protect the identity of informants and undercover officers. He also explained the procedure for disbursement of the cash used in a drug purchase. He testified that the disbursement of funds to Gately followed that procedure.

The parties stipulated that Gately correctly identified defendant as the person he met with on Adelbert Street and in the adjacent alley.

The State rested and defendant recalled Gately. Gately testified that, after he and Wellbank processed the evidence, Wellbank took it to the Monroe evidence locker. Shown his police report, Gately agreed that he had reported that Wellbank had taken the evidence to the Zone 2 drop box (in Rockford). This police report also referred to the cocaine evidence as "Exhibit 6." On cross-examination, he testified that all the information on the form associated with the evidence bag was correct. He further explained that he had reported that it was going to Zone 2, because that is what Wellbank had told him. After Gately's testimony, the defense rested.

The State, in closing argument, went through the steps in the chain of custody, noting the intact seal on the evidence bag and the single other cut to the bag--the one that Skelcy sealed with evidence tape. Defense counsel also argued chain of custody. In particular, he focused on the confusion between whether the evidence initially went to Rockford or Monroe.

The jury convicted defendant of the charged offense. Defendant filed a posttrial motion arguing, among other things, that the foundation for the admission of the cocaine exhibit was inadequate because of flaws in the chain of custody. The court denied the motion and sentenced defendant to 16 years' imprisonment; defendant filed a timely notice of appeal.

On appeal, defendant argues that the State failed to establish a sufficient chain of custody for the admission of the cocaine exhibit and its associated evidence, making the evidence insufficient to sustain his conviction. He asserts that, because the State did not explain the two times the evidence bag was handled when Wellbank put it in the drop box and when he retrieved it for Madigan to take it to the lab, the State failed to show that the police took reasonable protective measures. He also argues that the lack of evidence of a unique inventory number means that the police failed to use adequate measures to prevent the accidental substitution of samples. The State argues that the two weight measurements of the contraband, in combination with the officers' badge numbers and initials and the date, adequately identified it. Further, it argues that the evidence adequately explained the "extra" entries on the chain-of-custody form. We agree with defendant on one point; we deem that the State failed to provide proper evidence that no accidental substitution of the evidence occurred, so that the court should not have admitted the exhibit and related evidence. This was reversible error. However, we disagree with defendant that the flaws were such that the evidence was insufficient to convict him. Double jeopardy principles thus do not bar defendant's retrial. We start by explaining the flaw in the chain of custody and then explain why, despite the flaw, the evidence was sufficient for a conviction.

The rules of evidence require that, before the State can introduce results of chemical testing of a purported controlled substance, it must provide a foundation for their admission by showing "that the police took reasonable protective measures to ensure that the substance recovered from the defendant was the same substance tested by the forensic chemist." People v. Woods, 214 Ill. 2d 455, 467 (2005). (Woods states this standard in language applicable to a possession case, but of course the principle is the same for a delivery case.) Further, before admitting the physical evidence and

the test results, the trial court must determine whether the State has met its "burden to establish a custody chain that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." Woods, 214 Ill. 2d at 467. " '[A] trial court's ruling on the sufficiency of a chain of custody is subject to reversal only for an abuse of discretion.' " People v. Dixon, 228 Ill. App. 3d 29, 38 (1992), quoting Williamson v. Police Board, 182 Ill. App. 3d 304, 310 (1989).

Illinois decisions endorse the use of one unique identifier to show that each person in a chain of custody is describing the same piece of evidence; the unique identifier is typically a police inventory number. See, e.g., People v. Johnson, 361 Ill. App. 3d 430, 442-43 (2005). Use of one unique identifier is the simplest, and so the most satisfactory, method of showing that each person was handling the same evidence. Indeed, if police and crime lab procedure has been reasonable, we can see no reason that the State would present its foundational evidence in another form. That said, if the State does ignore the standard, but nevertheless establishes "a custody chain that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution" (Woods, 214 Ill. 2d at 467), a trial court arguably would have discretion to accept the foundation.[1] Despite that possible flexibility, the absence here of adequate protection against accidental substitution precludes our holding that the foundation was sufficient.

Wellbank and Gately described marking the evidence bag with their initials and badge numbers, the date, and other unspecified information. They also described weighing the baggie

---

[1]We have in mind the possibility that each custodian could use his or her own method to identify the object, as long as that method satisfactorily distinguishes the item from any other he or she might handle and allows him or her to reliably identify the item in court.

before placing it in the evidence bag, resulting in a measurement similar to Skelcy's. The State argues that the weight measurements, taken with the initials, badge numbers, and date, are sufficient to show that accidental substitution was improbable. We disagree. The State would have shown that accidental substitution was improbable only if it showed that it was improbable that the same officers would have handled another bag of white powder of similar weight on that day. Narcotics enforcement is SLANT's function, so we are not prepared to assume that two SLANT officers would not make two or more similar drug purchases in one day. Gately's vague testimony that this was "one of the higher purchases for the Freeport area" is insufficient to support that assumption.

Careful reading of the testimony suggests that the case for the foundation having been sufficient is stronger than the State's arguments on appeal would indicate. Several custodians' testimony raised points suggesting that the police labeled the evidence bag more thoroughly than the State's brief (and initial impressions) would suggest. Those additional points favoring admission are not enough, however, to change the result here. The additional points give only a fragmented view of the police treatment of the evidence. To meld and form those points into a basis for affirmance--even assuming that to be possible--would require us to engage in outright advocacy for the State's position. Such advocacy by the court is inappropriate. See People v. Rodriguez, 336 Ill. App. 3d 1, 14 (2002) ("While a reviewing court has the power to raise unbriefed issues *** we must refrain from doing so when it would have the effect of transforming this court's role from that of jurist to advocate"). We now review those points and explain why they do not form a clear basis for admission.

Madigan mentioned that the police had designated--and labeled--the cocaine exhibit as exhibit No. 6. (Gately mentioned this as well, but only after the court had already admitted the

exhibit.) Wellbank's and Gately's testimony shows that, after the rendezvous, Gately wrote in an area at the top of the bag information to which he did not testify. If we assume that Gately added the exhibit number after the rendezvous or that what Gately wrote at the top of the bag contained unique identifiers, our concerns about identification would be much alleviated. However, either assumption would be based on an inference that itself would be based on the assumption that the police acted reasonably. However fair that latter assumption is, it would be improper in this context. We cannot assume reasonable procedure; it is the State's burden to establish the use of such procedure. Woods, 214 Ill. 2d at 467.

We are aware that, unlike us, the trial court most likely could actually see the information on the evidence bag when it made its ruling. The court may have known what Gately wrote on the bag but that possibility does not compel a finding of admissibility, because the court did not make a record of any observations that led it to conclude that admission was proper. Furthermore, the State could have supplemented the record on appeal to indicate the unexplained information on the evidence bag, but the State failed to do so. Absent a complete record of the trial court's observations or any other record of the information on the bag, our review of the admissibility issue is limited to the witnesses' vague testimony in the transcript.

The State's "burden [was] to establish a custody chain that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." Woods, 214 Ill. 2d at 467. The initials, badge numbers, date, and weight measurements fail that standard as a matter of law. For us to accept other information as overcoming the weaknesses of that information would require us to become advocates for the State's position. Thus, despite the

deference we accord the trial court under an abuse of discretion standard, we must hold that admission of the exhibit was improper.

Although we conclude, based on the record before us, that the trial court erred in admitting the cocaine exhibit and related evidence, defendant is not entitled to an outright reversal; the State may retry him without offending double jeopardy principles. Both the federal and state constitutions provide that no person shall be put in jeopardy twice for the same criminal offense. People v. Pinkonsly, 207 Ill. 2d 555, 564 (2003), citing U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, §10. "The double jeopardy clause protects a defendant from: (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense." People v. Whitfield, 228 Ill. 2d 502, 516 (2007), citing People v. Gray, 214 Ill. 2d 1, 6 (2005).

Double jeopardy principles are implicated when a judgment of conviction is reversed, because the reversal might amount to an acquittal. A "reversal for trial error is a determination that the defendant has been convicted by means of a judicial process defective in some fundamental respect, whereas reversal for evidentiary insufficiency occurs when the prosecution has failed to prove its case, and the only proper remedy is a judgment of acquittal." People v. Olivera, 164 Ill. 2d 382, 393 (1995). The double jeopardy clause precludes the State from retrying a defendant after a reviewing court has determined that the evidence introduced at trial was legally insufficient to convict, but the double jeopardy clause does not preclude retrial of a defendant whose conviction has been set aside because of an error in the proceedings leading to the conviction. Olivera, 164 Ill. 2d at 393. "Moreover, retrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for purposes of double jeopardy all evidence

submitted at the original trial may be considered when determining the sufficiency of the evidence." Olivera, 164 Ill. 2d at 393, citing Lockhart v. Nelson, 488 U.S. 33, 40, 102 L. Ed. 2d 265, 273, 109 S. Ct. 285, 290 (1988).

Defendant may be retried if the error in the chain of custody is merely a defect in the judicial process, but the double jeopardy clause would preclude retrial if the error reflects an insufficiency of the evidence. The supreme court in Woods explained how evidence can fail as a foundation for drug evidence and yet be sufficient to allow a defendant's conviction. In Woods, the defendant tried to avoid his forfeiture of a chain-of-custody objection by framing his argument on appeal as a challenge to the sufficiency of the evidence. (The problem was one of how broadly a court should read a stipulation regarding the testimony of a forensic chemist.) The Woods court stated:

"We reject the notion that a challenge to the State's chain of custody is a question of the sufficiency of the evidence. A chain of custody is used to lay a proper foundation for the admission of evidence. Accordingly, a defendant's assertion that the State has presented a deficient chain of custody for evidence is a claim that the State has failed to lay an adequate foundation for that evidence. [Citation.] Thus, a challenge to the chain of custody is an evidentiary issue ***." Woods, 214 Ill. 2d at 471.

"When there is a complete failure of proof, there is no link between the substance tested by the chemist and the substance recovered at the time of the defendant's arrest," and the State's failure to present a sufficient chain of custody would lead to the conclusion that the State could not prove an element of the offense: the element of possession. Woods, 214 Ill. 2d at 472.

However, this case presents a different situation where there is a nexus between defendant and the substance. The State merely failed to establish a custody chain that sufficiently makes it

improbable that the evidence has been subject to tampering or accidental substitution. Thus, the deficiency in the State's case is better characterized as a trial error rather than evidentiary insufficiency, and double jeopardy principles do not bar retrial if the evidence presented at the first trial supports the conviction.

Although the court erred in admitting the exhibit and associated evidence, the admitted evidence was sufficient to convict defendant. Despite the improper foundation, the jury did not manifestly err in accepting Gately's testimony that he recognized the evidence bag as the one into which he and Wellbank placed his purchase from "Nubs." Further, it also could have accepted the evidence that the seal that Wellbank and Gately placed on the bag was intact and that Skelcy made the only other opening in the bag. Despite some uncertainty about who may have handled the evidence while it was in the care of the State Police in Rockford, if the jury credited the testimony about the seals, it could have reasonably concluded that Gately's purchase from defendant was indeed what Skelcy tested. The evidence was thus sufficient for defendant's conviction, and double jeopardy principles do not prevent his retrial.

As a final matter, we note that defendant argues that he is entitled to a $5-a-day credit against his fines for the 94 days he spent in custody before sentencing. We do not address that issue, as it is now moot, at least for the time being.

For the reasons given, we reverse the judgment of the circuit court of Stephenson County and remand the cause because defendant is entitled to a new trial.

Reversed and remanded.

McLAREN and BOWMAN, JJ., concur.