No. 2-08-1012     Filed: 11-15-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08--CF--359 |
| CARL E. BLANKENSHIP, | ) ) | Honorable Gary V. Pumilia, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Carl E. Blankenship, appeals his conviction of possession of a controlled substance (720 ILCS 570/402 (West 2008)). He argues that (1) the trial court's instructions and questions to prospective jurors did not comply with Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007); (2) the State failed to prove a chain of custody for the substance he was charged with possessing; and (3) the court lacked an evidentiary basis for imposing a $10 "street-value" fine. We affirm.

I. Rule 431(b)

Supreme Court Rule 431(b) states:

"The court shall ask each potential juror, individually or in a group, whether that juror <u>understands and accepts</u> the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the

State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." (Emphasis added.)

Official Reports Advance Sheet No. 8 (April 11, 2007) R. 431(b), eff. May 1, 2007.

In what follows, we often refer to the four principles as the "Zehr principles," after People v. Zehr, 103 Ill. 2d 472 (1984), the inspiration for Rule 431(b).

Defendant concedes that he raised no Rule 431(b) issue in the court below. See People v. Barrow, 133 Ill. 2d 226, 260 (1989) ("in general both an objection at trial and a written post-trial motion raising the issue are required to preserve that issue for review"). Defendant asks us to review the Rule 431(b) issue under the plain-error rule, which "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error" when "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" or when "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." People v. Herron, 215 Ill. 2d 167, 178-79, 186-87 (2005); see also 134 Ill. 2d R. 615(a). Without error, of course, there is no "plain" error, so we first determine whether there was error at all in the trial court's application of Rule 431(b). See People v. Hudson, 228 Ill. 2d 181, 191 (2008).

We find no error. Here the trial court gave the same admonitions and put the same questions to each prospective juror. The trial court informed each juror of all four Zehr principles and asked whether the juror "agree[d] with" the principles. Each juror answered yes. Defendant argues that

the trial court failed to comply with Rule 431(b) in that it did not separately ask whether the jurors understood the Zehr principles. Defendant points to the conjunctive in Rule 431(b): the trial court is directed to ask each "potential juror *** whether that juror understands and accepts" the Zehr principles (emphasis added) (Official Reports Advance Sheet No.8 (April 11, 2007), R. 431(b), eff. May 1, 2007).

This court recently applied Rule 431(b) in a similar factual scenario. In People v. Calabrese, 398 Ill. App. 3d 98 (2010), the defendant invoked the plain-error rule to preserve a Rule 431(b) challenge. The trial court in Calabrese informed the jurors as a body of all four Zehr principles, and, as each juror was selected for the venire panels, asked the juror individually whether he or she "'accept[ed]'" the principles the court had previously described. Calabrese, 398 Ill. App. 3d at 100. Each juror answered "'yes.'" Calabrese, 398 Ill. App. 3d at 100.

We found no error in the court's administration of Rule 431(b):

"Here, the trial court asked each juror whether he or she accepted the principles that the court had described, and each juror had the opportunity to ask questions or state that he or she did not understand or accept the principles. Each juror, however, responded that he or she did understand and accept the principles." (Emphasis added.) Calabrese, 398 Ill. App. 3d at 121.

The facts in Calabrese make no mention of any juror literally stating that he or she "understood" the Zehr principles. The jurors were, literally, asked only whether they "accept[ed]" the principles, and each responded "'yes.'" Nonetheless, we found that each juror "responded that he or she did understand and accept the principles" (emphasis added) (Calabrese, 398 Ill. App. 3d at 121). Tacit here was the premise that a rational juror (which we presume any juror to be (see People v. Wharton,

334 Ill. App. 3d 1066, 1080 (2002))) would not claim to accept the Zehr principles unless that juror believed he or she understood them. This premise was itself based on the notion that acceptance implies understanding, at least so far as Rule 431(b) is concerned. We expressly hold today what we implied in Calabrese.

We explain how our holding accords with the text of Rule 431(b). The canons of statutory interpretation apply to supreme court rules as well. Robidoux v. Oliphant, 201 Ill. 2d 324, 332 (2002). "As is the case with statutes, our primary task in construing a rule is to ascertain and give effect to the intent of its drafters." Robidoux, 201 Ill. 2d at 332. The most reliable indicator of intent is the language used, which should be given its plain and ordinary (Robidoux, 201 Ill. 2d at 332), or "popularly understood" (Gem Electronics of Monmouth, Inc. v. Department of Revenue, 183 Ill. 2d 470, 478 (1998)), meaning, unless this would defeat the intent of the drafters (People v. Scharlau, 141 Ill. 2d 180, 193 (1990)).

In Rule 431(b), "accepts" and "understands" are linked by "and." "And" is generally interpreted as conjunctive rather than disjunctive. Byung Moo Soh v. Target Marketing Systems, Inc., 353 Ill. App. 3d 126, 131 (2004). " 'As a general rule, the use of the conjunctive *** indicates that the legislature intended for all of the listed requirements to be met.' " (Emphasis in original.) Byung Moo Soh, 323 Ill. App. 3d at 131, quoting Gilchrist v. Human Rights Comm'n, 312 Ill. App. 3d 597, 602 (2000). Rule 431(b), however, prescribes no particular wording by which the trial court is to confirm that a juror "understands and accepts" the Zehr principles. We believe that, in common usage, to "understand" a proposition is to comprehend it, while to "accept" that proposition is both to comprehend it and to assent to it. "Acceptance" implies "understanding," but "understanding"

-4-

does not imply "acceptance." We see nothing in Rule 431(b) to indicate that we should not apply this popular usage.

That "understanding" does not imply "acceptance" was the basis of our decision in People v. Blair, 395 Ill. App. 3d 465, 473-74 (2009), where the trial court, with respect to certain of the Zehr principles, asked the jurors if they "understood" the principles without also asking them if they accepted the principles. We found that these efforts did not satisfy Rule 431(b). Blair, 395 Ill. App. 3d at 476-77. Similarly, in People v. Thompson, No. 109033, slip op. at 7 (October 21, 2010), our supreme court held that it was error for the trial court to ask the jurors whether they understood a certain Zehr principle without also asking whether they accepted it.

Here, by contrast, the trial court asked each juror if he or she "agreed[d] with" all four Zehr principles. These words were sufficient to confirm whether the jurors (in the language of Rule 431(b)) "accept[ed]" the Zehr principles. See People v. Willis, No. 1--08--2609, slip op. at 7-8 (May 21, 2010) (jurors asked if they would " 'follow' " the law as stated in the Zehr principles); People v. Schaefer, 398 Ill. App. 3d 963, 967 (2010) (jurors asked if they had " 'any problem' " with the Zehr principles). The words also sufficed to confirm whether the jurors comprehended, or (in the words of the rule) understood the Zehr principles.[1]

Even if we were to find error, we would not find that it rose to the level of plain error. Defendant does not argue that the evidence was closely balanced. Rather, he contends that the error

---

[1]We recognize that our holding places us in conflict with People v. Rogers, No. 2--08--0889 (August 6, 2010), a decision in which this court assumed that a trial court's failure to question jurors "about their understanding (as opposed to acceptance) of the Zehr principles" constituted error. Rogers, slip op. at 6-7. For the reasons above, we follow Calabrese and depart from Rogers.

was so serious that it deprived him of his substantial right to a fair and impartial jury. Defendant has not, however, presented any evidence that the jury was biased. As defendant bears the burden of persuasion under the plain-error doctrine, his failure to present any evidence of a biased jury prevents the second prong of the plain-error doctrine from serving as a basis for excusing defendant's forfeiture of this issue. Thompson, slip op. at 13 (where the defendant failed to present any evidence of a biased jury, he failed to meet his burden under the second prong of the plain-error doctrine, and the court would not review the error). As our supreme court recently stated, "[w]e cannot presume the jury was biased simply because the trial court erred in conducting the Rule 431(b) questioning." Thompson, slip op. at 12.

As there was no error, much less plain error, in the trial court's application of Rule 431(b), defendant has not bypassed the forfeiture rule.

## II. Chain of Custody

On January 29, 2008, at approximately 1:30 p.m., Rockford police executed a search warrant at 1526 Broadway, apartment 3. The apartment was allegedly the site of narcotics activity. Detectives James Rossow and Robert Veruchi were among several officers who executed the warrant. Inside the apartment they found several occupants, including defendant.

Veruchi testified that he was assigned to collect evidence recovered during the search. Veruchi said, "When an item was located by any of the other officers that were executing the search warrant, they would notify me, and then I would go over and process the evidence."

Veruchi testified that, when he and his fellow officers entered the apartment, they saw several occupants. At one point during the search, Veruchi was asked to approach Rossow. Veruchi went over to Rossow and saw defendant standing nearby. Veruchi saw another occupant sitting about four

feet away from defendant and Rossow. This other occupant had been handcuffed. Veruchi was informed that Rossow had recovered money and "suspected cocaine" from defendant. Veruchi received the substance and weighed it on a portable scale. The substance weighed less than 15 grams. Veruchi then performed a field test on the substance, and the result was positive for the presence of cocaine. Shown State Exhibit 1, Veruchi said: "This is the package and appears to be the cocaine that I collected on that date." Veruchi testified further:

"Q. *** How do you know it would be that cocaine that you collected on that date?

A. It's got my handwriting all over the bag with the case number, the time, the date, and all the particulars that were involved with this piece of evidence.

***

Q. What are the changes to it that you're noting?

A. It appears that the State Crime Lab opened the bottom of the package and then broke the cocaine into a couple different packages.

Q. Okay. Other than the addition of the State Crime Lab's tags and seals, is that evidence in the same or substantially the same condition as when you tagged it into evidence on January 29, 2008?

A. Yes."

Veruchi did not describe any further handling by him of the evidence.

Rossow testified that, when he and the other officers entered the apartment on January 29, 2008, they handcuffed the occupants and secured the residence. Rossow "focused" on defendant and asked for permission to search him. Defendant gave consent, and Rossow recovered from defendant's front pants pocket a "clear, plastic baggy corner that contained an off-white, rock-like

substance that resembled crack cocaine." Rossow handed the baggy to Veruchi, who was assigned to collect evidence at the scene. Rossow was then asked about State Exhibit 1:

"Q. *** Showing you [State Exhibit 1]. What is [it]?

A. This is in a different form, except [for] the State Crime Lab's markings. This is the item located on [defendant] on [January 29, 2008].

Q. And how do you recognize it to be that cocaine?

A. Well, I gave this to Detective Veruchi at which time I observed him tag this into evidence, and it has Detective Veruchi's handwriting plus initials on the bag.

Q. And other than the markings by the State Crime Lab which have been entered, is it in the same or substantially same condition as when you took it into evidence on that date?

A. It appears to be, yes."

On cross-examination, Rossow was asked whether "[t]he last time [he] saw [State Exhibit 1] before today was when he handed it to Detective Veruchi." He answered: "[W]hen we got back to the narcotics office, I observed Detective Veruchi tagging the item into evidence."

The State's third and final witness was Rhonda Shively-Earl, a chemist with the Illinois State Police crime lab (ISP lab). Shively-Earl testified that State Exhibit 1:

"[i]s a piece of evidence that was submitted to the laboratory for testing. I can identify it by an Illinois State Police case exhibit sticker on the evidence bag. That has my markings. I can also identify it by a seal at the bottom of the evidence bag that has my markings and by internal packaging that has my markings."

Asked what she meant by "my markings," Shively-Earl replied: "On the sticker it's my initials and

the date. On the other seals, it is my initials, the date, the case number and the Exhibit No." Shively-Earl testified that she received State Exhibit 1 on January 31, 2008, from Patty Bond, an evidence carrier for the Rockford police. Shively-Earl testified that, when the ISP lab receives evidence:

"We put the Exhibit No. sticker on it, and we put our markings on that sticker and at that point inspect the seals and then store it in our vaults, or in this particular case I stored this in my vault until a later time."

Shively-Earl testified that State Exhibit 1 remained in the vault at the ISP lab until June 2008, when Shively-Earl conducted her analysis of the substance. Asked what "condition *** [State Exhibit 1 was] in, when [she] received it" from the law enforcement agency, Shively-Earl answered, "[T]here was a chunky substance in the knotted bag." Shively-Earl explained that, for purposes of testing and weighing, she "removed [the substance] from the knotted bag and packaged them separately and sealed them into a new plastic bag."

Shively-Earl testified that she weighed the substance from the knotted bag and saw that it weighed less than 15 grams. Shively-Earl then removed a portion of the substance and tested it for the presence of cocaine. The substance tested positive. After the test, Shively-Earl "resealed [the substance] in the evidence bag *** and *** replaced it in [her] evidence vault until a later time when [she] could return it to the agency."

The State moved to admit State Exhibit 1, and defendant objected that the State had not proven a chain of custody for the exhibit:

"We don't have any testimony, first of all, as to how long it took the item to get from Detective Veruchi to, well, what happened between Detective Veruchi and Patty Bond, how much time it took to get from Patty Bond to Mrs. Earl, as well as--Well, there was some

testimony as to seals. There wasn't testimony--there was testimony as to the fact by both Detective[s] Veruchi and Rossow that the substance was different in the packaging now from when they packaged it.

There was no testimony from Mrs. Earl as to what condition, other than her saying that it was sealed, what it was in, what it looked like, anything of that nature that would be able to verify that the substance what we're talking about that was recovered by Detective Rossow and given to Detective Veruchi is the same substance that was tested by Mrs. Earl.

It[']s not something where this is a unique item. It's cocaine. Cocaine is cocaine, or even lookalikes of cocaine are all going to look similar, so I would argue that the chain of custody has not been properly shown to verify that what was recovered by Detective Rossow is the same thing that was tested by Mrs. Earl, and it's also what is here in court today."

The court admitted State Exhibit 1 without explanation.

While this appeal was pending, defendant moved to supplement the record with several pages of reports from the Rockford police. The State did not object, and we granted the motion. The police reports detail items seized during "the execution of a search warrant at 1526 Broadway apartment number three on 1-29-08 at 1320 hours." The reports list the following items identified as suspected drugs:

| Evidence Tag # | Description |
|---|---|
| D02331 | Clear plastic Evidence bag containing an off white rock like substance that field tested positive for the probable presence of cocaine with a net weight of .11 grams. Located inside of a key chain that was inside of Curry's right front pants pocket. Located by Officer ~~Speltz~~ Krantz.. |
| D02332 | Clear plastic Evidence bag containing an off white powder substance that [field] tested positive for the probable presence of heroin with a gross weight of .11 grams. Located inside of a key chain that was inside of Curry's right front pants pocket. Located by Officer ~~Speltz~~ Krantz. |
| D02321 | Clear plastic evidence bag containing 1 baggie that contain[ed] an off white rock like substance that field tested positive for the probable presence of cocaine with a gross weight of .83 grams. Located in the front right pants pocket of Blankenship by Det. Rossow. |

We set forth the law governing chain-of-custody issues. Before the trial court may admit real or physical evidence of an offense, "the State must provide an adequate foundation either by way of live testimony or a stipulation that establishes that the item sought to be admitted is the actual item involved in the alleged offense and that the item's condition is substantially unchanged." People v. Garth, 353 Ill. App. 3d 108, 114 (2004). "[W]here an item has readily identifiable and unique characteristics, and its composition is not easily subject to change, an adequate foundation is laid by testimony that the item sought to be admitted is the same item recovered and is in substantially the same condition as when it was recovered." People v. Woods, 214 Ill. 2d 455, 466 (2005). "However, in cases *** where a defendant is accused of a narcotics violation, the physical evidence

is often not readily identifiable or may be susceptible to tampering, contamination[,] or exchange. In such instances, the State is required to establish a chain of custody." Woods, 214 Ill. 2d at 466-67.

"The State bears the burden to establish a custody chain that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." Woods, 214 Ill. 2d at 467. "Unless the defendant produces evidence of actual tampering, substitution[,] or contamination, a sufficiently complete chain of custody does not require that every person in the chain testify, nor must the State exclude every possibility of tampering or contamination; the State must demonstrate, however, that reasonable measures were employed to protect the evidence from the time it was seized and that it was unlikely that the evidence has been altered." Woods, 214 Ill. 2d at 467. " 'Once the State has established the probability that the evidence was not compromised, and unless the defendant shows actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence.' " Woods, 214 Ill. 2d at 467, quoting People v. Bynum, 257 Ill. App. 3d 502, 510 (1994). The trial court's ruling on the sufficiency of a chain of custody will be reversed only if there was an abuse of discretion. People v. Howard, 387 Ill. App. 3d 997, 1004 (2009).

Defendant argues that the State failed to make a prima facie showing of a chain of custody for the cocaine, because the State did not account for the handling of the cocaine after it was processed by Veruchi and before it came into the possession of Bond. The State responds that the proper showing was made, because "[g]enerally[,] identification by inventory number and a description of an item[] is sufficient to establish a proper chain of custody." The State notes that Veruchi and Shively-Earl "identified the specific item by description and by the numbers and

identifying marks on the packaging." The State further argues that "the jury and the trial court saw [State Exhibit 1] in open court and would have seen the packaging at issue and could see whether it appeared as described by the witnesses."

There is no dispute that the State did not adduce the testimony of every custodian in the chain leading from the seizure of the drugs by Rossow to their receipt by Shively-Earl. Specifically, there was no evidence of how the drugs came into the possession of Bond after Veruchi weighed and tested them. Case law, however, shows that the State may remedy a gap in the chain of custody. One method is to show the existence of a "unique identifier" marked on the evidence. This court has described this method as follows:

"[W]hen no positive evidence of tampering or other contamination exists, the proponent of the evidence can replace a missing link, created when one or more custodians of the evidence do not testify, with evidence (1) that the evidence left the hands of one testifying custodian in a sealed envelope or other container and arrived in the hands of the next testifying custodian still in a sealed container, and (2) that the identifying number or code on the container sent out matches that on the container received." People v. Johnson, 361 Ill. App. 3d 430, 441-42 (2005).

As we later said in Howard:

"Illinois decisions endorse the use of one unique identifier to show that each person in a chain of custody is describing the same piece of evidence; the unique identifier is typically a police inventory number. [Citation.] Use of one unique identifier is the simplest, and so the most satisfactory, method of showing that each person was handling the same evidence." Howard, 387 Ill. App. 3d at 1004.

Here Veruchi testified to a "case number" on State Exhibit 1. Veruchi did not, however, describe what this number signified, and in the absence of such testimony we cannot ascertain whether the number was unique to defendant. There was evidence that defendant was not the only individual arrested during the search of apartment 3. The "case number" might be a general designation for the warrant authorizing the search of apartment 3 or for the arrest(s) made during the search. We conclude that the State did not prove the existence of a unique identifier on the evidence.

Reference to a unique identifier is not, however, the only means by which the State may compensate for a gap in the custodial chain for drug evidence. In Woods, a drug case, the supreme court said:

"Even where the chain of custody has a missing link, 'trial courts have properly admitted evidence where there was testimony which sufficiently described the condition of the evidence when delivered which matched the description of the evidence when examined.' "

Woods, 214 Ill. 2d at 467-68, quoting Bynum, 257 Ill. App. 3d at 510.

See also People v. Lundy, 334 Ill. App. 3d 819, 828 (2002) ("the State was required to show, at the very least, that the condition of the narcotics delivered by [the police] matched the description of the narcotics examined by [the lab technician]" (emphasis in original)).

For instance, in People v. Pettis, 184 Ill. App. 3d 743 (1989), cited by Woods as authority for the "matching descriptions" method of proof, police officers testified that they seized from the defendant a plastic baggy containing suspected drugs. The officers testified that, after testing and weighing the substance, they placed the baggy in an evidence bag, sealed it, and initialed it. The officers identified the State's exhibit as the evidence bag they had prepared, and they noted that it was in the same condition as when it left their custody, except for (1) openings made in the bag by

the State lab and by defense counsel (for independent testing), and (2) certain markings. Similarly, the crime-lab chemist testified that, except for certain markings made by the police, the evidence bag and its contents were in the same condition as when the chemist received it. Pettis, 184 Ill. App. 3d at 747-48.

The defendant in Pettis argued that the State failed to establish the chain of custody, because it did not prove how the drugs were handled during the nine-day period between their delivery to the crime lab and their testing by the chemist. The appellate court held that, though there was a "missing link" as the defendant described, "[s]ince there [was] testimony describing the condition of the exhibit when delivered [by the police to the crime lab] which matche[d] the description of the exhibit when it was later examined by [the chemist], the evidence [was] sufficient to establish chain of custody." Pettis, 184 Ill. App. 3d at 754.

Here, the State made a prima facie case through the "matching descriptions" method. Veruchi testified that State Exhibit 1 was in the same or substantially the same condition as when he last saw it. Veruchi testified that State Exhibit 1 was different only in that the ISP lab had "opened the bottom of the package and then broke the cocaine into a couple different packages." Veruchi's description of how State Exhibit 1 differed from when he last saw it was consistent with Shively-Earl's testimony as to what she did with State Exhibit 1 as part of the testing and weighing process at the ISP lab.

Thus, the evidence of matching descriptions was sufficient to overcome the gap in the custodial chain and establish a prima facie case. Hence it was defendant's burden to produce "evidence of actual tampering, substitution[,] or contamination" (Woods, 214 Ill. 2d at 467). Defendant points to the police reports reflecting that the police seized suspected cocaine from at least one person aside from defendant during the search of apartment 3 on January 28, 2009. Though we

allowed the appellate record to be supplemented with the police reports, the reports apparently were not admitted into evidence at trial. Therefore, we may not consider them. See People v. Long, 208 Ill. App. 3d 627, 638 (1990) (declining to consider police reports not admitted at suppression hearing). The evidence at trial did show, as defendant claims, that "at least one other person in the apartment was under arrest and already handcuffed at the time the officers allegedly found cocaine on [defendant]." There was, however, no testimony at trial that suspected drugs were seized from anyone besides defendant. Defendant, therefore, failed to rebut the State's prima facie case.

Defendant cites two cases, People v. Gibson, 287 Ill. App. 3d 878 (1997), and Howard. In Gibson, the chain-of-custody evidence came in through the testimony of one officer, O'Donnell, and a stipulation. O'Donnell testified that he seized from the defendant a clear plastic packet, inside of which were 19 smaller packets containing a substance the officer believed to be cocaine. O'Donnell testified that, when he arrived at the police station, he weighed the substance and derived a weight of two grams. O'Donnell then assigned the evidence inventory number 1441897. Gibson, 287 Ill. App. 3d at 879. The parties stipulated " 'that Inventory 1441897 was tested at the Chicago Crime Lab by Francis Mannison; that the total items received were 20, the total estimated weight was 9.3 grams; that three items were tested and a total weight tested was 1.49 grams of cocaine, crack form.' " Gibson, 287 Ill. App. 3d at 879.

The appellate court held that the State did not present a prima facie case for a chain of custody. The court first noted the "almost *** five-fold increase" in the total weight of the substance between O'Donnell's testimony and the stipulation. Gibson, 287 Ill. App. 3d at 882. The court then pointed to a significant "break" in the chain of custody:

"Not only was there no evidence regarding the handling and safekeeping of the evidence between the custody of Officer O'Donnell and Mannison, there was also no evidence specifically detailing what procedures Officer O'Donnell himself employed with regard to the safekeeping of the evidence. [Citation.] Indeed, other than testimony of Officer O'Donnell that he inventoried the evidence under number 1441897, the only other evidence offered to prove the chain of custody was the stipulation, which merely established that Mannison tested the evidence assigned to inventory number 1441897 and found there to be 20 items weighing a total of 9.3 grams." Gibson, 287 Ill. App. 3d at 882.

The court concluded that, given the gap in the custodial chain and the "substantial discrepancies as to the weight of the evidence," the State failed to carry its initial burden. Gibson, 287 Ill. App. 3d at 882.

Defendant notes that, as in Gibson, there was a break in the chain of custody here since there was no evidence of how State Exhibit 1 passed between Veruchi and Bond. In Gibson, however, there was a vast disparity between the weight of the substance logged in by police and the weight of the substance tested by the crime lab. Given this evidence of "actual tampering, substitution[,] or contamination," the State had to adduce the testimony of every custodian in the alleged chain (Woods, 214 Ill. 2d at 467), but the State did not. Here, by contrast, there was no evidence of any such weight disparity, and hence the State did not have to "exclude every possibility of tampering or contamination" but had only to show that "the police took reasonable protective measures to ensure that the substance recovered from the defendant was the same substance tested by the forensic chemist." Woods, 214 Ill. 2d at 467.

In Howard, there was testimony from the two police officers who originally packaged the suspected cocaine they seized from the defendant. The officers, Gately and Wellbank, were

members of the State Line Area Narcotics Team (SLANT) when they conducted the operation that resulted in the defendant's arrest. Gately and Wellbank identified the State's exhibit as the package in which they had placed the suspected cocaine. Gately testified that the date, his initials, and his and Wellbank's badge numbers, were on the package. Wellbank testified that the date, and his and Gately's initials, were on the package. Wellbank also testified that an " 'I.D. number' " was on the package but Wellbank did not explain the nature of this number. Howard, 387 Ill. App. 3d at 1000. Gately and Wellbank also testified that the suspected cocaine weighed 53 grams on their portable scale (but they did not mention whether the weight was indicated on the package). Howard, 387 Ill. App. 3d at 998. There was testimony that the package changed hands several times (with a certain period unaccounted for) until it was received by the lab chemist, who found that the substance inside the package weighed 51.2 grams. Howard, 387 Ill. App. 3d at 1001.

This court reversed the trial court's ruling admitting the package. This court noted that there was no testimony that the package had a unique identifier, and we held that "the initials, badge numbers, date, and weight measurements fail[ed] *** as a matter of law" to show the improbability of tampering or accidental substitution. Howard, 387 Ill. App. 3d at 1006. This court explained that the information that was identified on the package:

"would have shown that accidental substitution was improbable only if it showed that it was improbable that the same officers would have handled another bag of white powder of similar weight on that day. Narcotics enforcement is SLANT's function, so we are not prepared to assume that two SLANT officers would not make two or more similar drug purchases in one day." Howard, 387 Ill. App. 3d at 1005.

Defendant notes that, where the court in Howard assumed from the nature of SLANT's duties that the officers' handled drugs regularly, here there was specific evidence showing the possibility of

accidental substitution, namely the police reports reflecting that the police seized suspected cocaine from at least one person aside from defendant during the search of apartment 3 on January 28, 2009. Again, as those reports were not admitted at trial, we may not consider them.

Defendant also claims that the evidence is unclear as to when and where Veruchi processed and packaged the suspected drugs. Defendant notes that Rossow testified on direct examination that, upon seizing the drugs from defendant, Rossow passed them to Veruchi, "at which time [Rossow] observed [Veruchi] tag [it] into evidence." On cross-examination, however, Rossow testified that, when he and Veruchi "got back to the narcotics office, [Rossow] observed Detective Veruchi tagging the item into evidence." Defendant argues that this discrepancy is important because Veruchi did not identify "where he was when he processed the evidence."

We reject this line of argument. Describing his role during the search of apartment 3, Veruchi said, "When an item was located by any of the other officers that were executing the search warrant, they would notify me, and then I would go over and process the evidence." We take this to mean that Veruchi processed the evidence at the scene, contemporaneously with receiving it. If defendant has in mind a difference between "processing" the evidence and "packaging" it, he does not develop the distinction. As for the discrepancy in Rossow's testimony, it may well mean that Veruchi processed and packaged the evidence at the scene but inventoried it at the station.

We close with some concerns we have about Howard's approach to chain-of-custody issues. Howard noted the absence of a unique identifier on the evidence package and held that the police officers' "initials, badge numbers, and date" on the package, and the similarity between the weights of the substance when processed by the police and tested by the lab chemist, failed "as a matter of law" to satisfy the State's initial burden. Howard, 387 Ill. App. 3d at 1006. The phrase "as a matter of law" suggests a general rule, as if the State's case will fail in all circumstances where a unique

identifier is absent, or at least where the only information identified on the evidence package is the officer's initials and badge number and the date. If this were Howard's intent, we would take exception with such a rule because it would curb the flexibility that the case law consistently grants the State in establishing a prima facie case. See, e.g., People v. Bishop, 354 Ill. App. 3d 549, 560 (2004) (no unique identifier; officer identified evidence package by other markings); Pettis, 184 Ill. App. 3d at 747-48 (no unique identifier; officers testified that, except for markings made by crime lab, package was in substantially the same condition as when they handled it).

Even if Howard did not intend so broad a pronouncement, its narrow holding is questionable because it disrupts the proof scheme that controls chain-of-custody issues. Here it is important to note where Howard believed the State's proof failed. Howard held that the officers' testimony did not show that "accidental substitution was improbable." Howard, 387 Ill. App. 3d at 1005. What the court indicated was that it was not improbable that the officers, when asked to identify the evidence package, did not confuse the drugs seized from the defendant with other drugs. We question the court's path to this conclusion. The officers in Howard testified that they processed the drugs in the field after seizing them from the defendant. They identified the evidence package by certain markings, i.e., the date, the time, and their initials, and they noted the respects in which the package was different from when they had handled it, specifically that it had been opened by the crime lab, then sealed and marked with initials. We believe this testimony was sufficient under the case law to show that the police took proper protective measures by which they could differentiate the drugs seized from the defendant. See Bishop, 354 Ill. App. 3d at 560; Pettis, 184 Ill. App. 3d at 747-48. It therefore was incumbent upon the defendant to show evidence of actual tampering or substitution. The court in Howard pointed to no specific evidence of actual substitution. Instead, because "[n]arcotics enforcement [was] SLANT's function," the court was "not prepared to assume

that two SLANT officers would <u>not</u> make two or more similar drug purchases in one day." (Emphasis added.) <u>Howard</u>, 387 Ill. App. 3d at 1005. Rephrased so as to delete the double negative, this was effectively a presumption that the police officers <u>did</u> make two or more similar drug purchases on the day the defendant was arrested. If the police officers in <u>Howard</u> were generally assigned to tasks having absolutely nothing to do with narcotics, would the court have made a different presumption and concluded that there was no probability of accidental substitution? Once the State has established that the police took "reasonable measures *** to protect the evidence from the time *** it was seized and that it [is] unlikely that the evidence has been altered" (<u>Woods</u>, 214 Ill. 2d at 467), it is the defendant's burden to raise issues challenging the officers' testimony by, <u>e.g.</u>, actually asking on cross-examination if the officers made "two or more similar drug purchases in one day" (<u>Howard</u>, 387 Ill. App. 3d at 1005). Engaging in speculative presumptions based on the officers' assigned duties is not the proper way to proceed. We have found no authority to suggest that, in a drug case, the State must establish as part of its <u>prima facie</u> case that no drugs were seized by the same officers that day from anyone other than the defendant. <u>Pettis</u>, which was relied on by the supreme court in <u>Woods</u>, is just one example of a case where no such showing was made (or, impliedly, was required). In <u>Pettis</u>, there was no evidence of what other law enforcement activities the officers were engaged in on the day they seized drugs from the defendant. Moreover, the officers' initials were the only markings of theirs that they identified on the State's exhibit. In <u>Howard</u>, not only were the officers' initials on the package but also the date the drugs were seized. The evidence in <u>Pettis</u> closed the universe of possible substitution to a far lesser degree than that in <u>Howard</u>, but the court in <u>Pettis</u> found the State's <u>prima facie</u> case established.

We believe that, in <u>Howard</u>, the burden shifted to the defendant when the officers differentiated the drugs by date, weight, and arresting officer, and it then became the defendant's

burden to show by specific evidence that there were other drugs seized that day by the same officers. The defendant could not discharge that burden by relying on a presumption based on the nature of the officers' duties. There would be no meaning in shifting the burden of proof to the defendant if he could meet his burden through speculative presumptions. To the contrary, when the burden shifted to the defendant, the chain of custody was presumed to be established, and the defendant had to rebut it with specific evidence. As we said in Johnson:

"[A]bsent positive evidence of a compromising event, such an event's existence is nothing more than a reasonable hypothesis. The mere existence of a reasonable hypothesis consistent with a defendant's innocence is not enough to necessarily create a reasonable doubt of his or her guilt. [Citation.] Thus, to create a reasonable doubt, a flaw in a foundation based on chain of custody must do more than provide an opportunity for speculation about events in which the integrity of evidence could possibly have been compromised." Johnson, 361 Ill. App. 3d at 437.

We also question Howard's comments following its determination that the officers' testimony was too vague as to whether some additional markings on the evidence package included an identification number or other unique identifier. Howard noted that there was no source, other than the witnesses' testimony, as to the nature of the markings:

"We are aware that, unlike us, the trial court most likely could actually see the information on the evidence bag when it made its ruling. The court may have known what Gately wrote on the bag but that possibility does not compel a finding of admissibility, because the court did not make a record of any observations that led it to conclude that admission was proper. Furthermore, the State could have supplemented the record on appeal to indicate the unexplained information on the evidence bag, but the State failed to do so.

Absent a complete record of the trial court's observation or any other record of information on the bag, our review of the admissibility issue is limited to the witnesses' vague testimony in the transcript." Howard, 387 Ill. App. 3d at 1006.

We see two problems with this analysis. The first is the suggestion that this court is itself unable to procure and review physical evidence. In fact, in Johnson (cited by Howard), this court ordered one of the parties to supplement the record on appeal with the evidence envelopes in question. This court examined the exterior of the envelopes and verified what numbers were written on them. See Johnson, 361 Ill. App. 3d at 439. We see no reason why the Howard court could not have done the same.

Second, the court in Howard deemed the State responsible for the gap in the record as to the nature of the markings. In fact, it was the defendant, as the appellant, who had the duty of providing a record to support his allegations of error, and any record omissions were to be construed against him. People v. Bowman, 357 Ill. App. 3d 290, 298-99 (2005) ("As the appellant, defendant has the burden to provide a sufficiently complete record to support a claim of error, and any doubts that arise from the incompleteness of the record will be resolved against defendant"). The Howard court construed in the defendant's favor, not the State's, the vagueness about the additional markings on the package.

For the foregoing reasons, we hold that the State made a prima facie case for chain of custody and that defendant did not identify any evidence of actual tampering or substitution. Accordingly, the trial court did not err in admitting State Exhibit 1.

### III. $10 Street-Value Assessment

At the sentencing hearing, the trial court imposed a period of incarceration and then turned to the matter of fines:

"THE COURT: *** I'm going to sentence you to a period of three years in the Department of Corrections. This is not as serious a case as the last one you went down for, that's why I'm not giving you the extended term, but I'll sentence you to a period of three years [in the] Department of Corrections. There's a year of mandatory supervised release, $500 lab testing fee, $100 Trauma Fee.

MR. MORRISON [Assistant Public Defender]: $100 drug assessment?

THE COURT: Lab fee $100. Thank you, Mr. Morrison. I got to tell you right offhand, I do not know what the street value is; point 83 grams.

MS. QUADE [Assistant State's Attorney]: Be [sic] $10.

THE COURT: $10 street value fine, court cost $273. Year of parole goes along with this, mandatory supervised release."

The court imposed the street-value fine according to section 5--9--1.1(a) of the Unified Code of Corrections (730 ILCS 5/5--9--1.1 (West 2006)).

Defendant argues that the fine was improper because there was no evidence to support it. Defendant acknowledges that he failed to preserve this issue for appellate review but urges us to review his argument under the plain-error doctrine. Where a street-value fine is based on insufficient evidence, there is both error and plain error because "imposing the fine without any evidentiary support in contravention of the statute implicates the right to a fair sentencing hearing," and "the integrity of the judicial process is also affected when a decision is not based on applicable standards and evidence, but appears to be arbitrary." People v. Lewis, 234 Ill. 2d 32, 48 (2009); see also People v. Spencer, 347 Ill. App. 3d 483, 488 (2004) (because "the legislature intended for courts to impose the fine with some concrete evidentiary basis," the "failure to support a street value fine with any evidentiary basis constitutes plain error"). We find no error, and so no plain error.

Section 5--9--1.1(a) provides:

"(a) When a person has been adjudged guilty of a drug related offense involving possession or delivery of cannabis or possession or delivery of a controlled substance ***, in addition to any other penalty imposed, a fine shall be levied by the court at not less than the full street value of the cannabis or controlled substances seized.

'Street value' shall be determined by the court on the basis of testimony of law enforcement personnel and the defendant as to the amount seized and such testimony as may be required by the court as to the current street value of the cannabis or controlled substance seized." (Emphasis added.) 730 ILCS 5/5--9--1.1(a) (West 2006).

The emphasized requirement was construed as follows in Lewis, 234 Ill. 2d at 46:

"While *** section 5--9--1.1(a) only mandates 'such testimony as may be required by the court' on the current street value of the controlled substance, the statute also clearly requires the fine to be based on the substance's current value. There must be some evidentiary basis for street value in the record for the court to comply with the statutory mandate of imposing a fine at least equal to the street value of the controlled substance.

The evidentiary basis may be provided by testimony at sentencing, a stipulation to the current value, or reliable evidence presented at a previous stage of the proceedings. [Citation.] The legislature apparently acknowledged current street value may have already been established by providing only for 'testimony as may be required by the court' on the current value. Testimony on current street value may not be required by the court at sentencing if the value of the controlled substance has already been established. Nonetheless, an evidentiary basis for the street value of the controlled substance is required

to comply with section 5--9--1.1(a)'s core requirement of imposing a fine 'at not less than the full street value.' "

The State notes <u>Lewis</u>'s comment that street value may be set by "stipulation" and argues that defendant, by not disputing the assistant State's Attorney's representation about street value, tacitly stipulated to the value. We agree. From the transcript, it appears that the court's inquiry about the street value of the drugs was a request to both parties for input. The State gave its opinion on street value. Defendant said nothing--neither proposing his own value nor even simply rejecting the State's opinion. Stipulations by silence have been found under comparable circumstances. See <u>People v. Evans</u>, 57 Ill. App. 3d 1044, 1051-52 (1978) (defendant's silence when State announced that it was nol-prossing the burglary charge with the understanding that the burglary would be introduced in aggravation at sentencing); <u>People v. Johnson</u>, 121 Ill. App. 2d 97 (abstract op.), 257 N.E.2d 121, 123 (1970) (defendant's silence when codefendant stipulated that victim's testimony would be the same at trial as at the preliminary hearing). We find no error in the imposition of the $10 street-value fine.

For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County.

Affirmed.

JORGENSEN and SCHOSTOK, JJ, concur.