2018 IL App (2d) 150650
No. 2-15-0650
Opinion filed March 6, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-939 |
| SCOTT PETERS, | ) ) | Honorable Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Jorgensen and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, the defendant, Scott Peters, was convicted of the attempted murder (720 ILCS 5/9-1(a)(1), (b)(1), 8-4(a) (West 2014)) of three deputy sheriffs and was sentenced to a total of 135 years' imprisonment.  On appeal, the defendant argues that (1) he was not proved guilty beyond a reasonable doubt of trying to kill one of the deputies, (2) the trial court did not conduct a proper hearing on his motion under *People v. Krankel*, 102 Ill. 2d 181, 187-89 (1984), (3) the trial court did not properly question the jury pursuant to *People v. Zehr*, 103 Ill. 2d 472 (1984), (4) he was denied his constitutional right to be present at all critical stages of the trial, (5) he was deprived of a fair trial by the State's prejudicial closing arguments, and (6) he was deprived of the effective assistance of counsel.  We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Early in the morning of October 16, 2014, McHenry County Sheriff's Deputies Dwight Maness, Khalia Satkiewicz, and Eric Luna went to the defendant's residence in Holiday Hills to conduct a well-being check on the defendant's wife. The deputies arrived in separate vehicles and parked on Hyde Park Avenue, about 300 feet from the residence, which had a fence on the east side.

¶ 4    Deputies Maness and Satkiewicz went through a driveway entrance to the front door of the residence, while Deputy Luna went around to the east side and rear of the house. There was a minivan and a pickup truck in the driveway. The house had glass block windows. Deputy Luna saw lights on and movement inside but could not see people. Deputies Maness and Satkiewicz noticed surveillance cameras on the garage and near the front door. The cameras moved when the deputies moved.

¶ 5    Deputies Maness and Satkiewicz knocked loudly on the front door but did not receive any answer. From his position, Deputy Luna could hear them knocking and what they were saying. They knocked again and still did not receive an answer, but Deputy Satkiewicz noticed a blind in the window move. After the deputies knocked a third time, the defendant asked, "Who is it?" The deputies announced that they were McHenry County Sheriff's deputies, and the defendant replied, "What do you want?" When the deputies told the defendant that they were there to check on his wife, he told them that there was no problem and that they needed to leave. The deputies explained that they could not leave until they spoke with his wife. The defendant again told them that they needed to leave and that they could not come into the house. The deputies responded that they would not leave until they spoke with his wife. That statement was

met with silence for about 10 to 15 seconds. The defendant then told the deputies, "Come on in."

¶ 6    Deputy Maness asked the defendant if he was going to open the door. The defendant again told the deputies to "come on in." Deputy Maness was concerned that he was walking into an ambush, so he again told the defendant that he needed to come outside. In response, the defendant then said, "We're going to do this, let's do this. Airborne." When Deputy Maness heard "Airborne," he started to take cover and pushed Deputy Satkiewicz out of the way as shooting erupted from inside the house through the door. Deputy Luna heard rapid gunfire and ran to the front of the garage, taking cover between the minivan and the garage door.

¶ 7    Deputy Maness was shot in the lower part of his back. He went around a vehicle and passed Deputy Luna, who was at that vehicle. Deputy Luna, who could see a silhouette of what looked like a man with a rifle to the west side of the garage, told Deputy Maness to take cover, saw Deputy Satkiewicz with a rip in her pants, and then started shooting. Deputy Maness called command to report that shots had been fired. He also requested two ambulances because Deputy Satkiewicz told him that she had been hit. Deputy Luna saw a muzzle flash from the rifle that the defendant pointed down the driveway toward Deputy Satkiewicz. From behind the van, Deputy Luna fired eight shots at the defendant.

¶ 8    As Deputy Maness was trying to return to his squad car, he was shot a second time, in the leg. The defendant called out, "I'm a U.S. Army paratrooper, I hope you're ready to die 'cause I am." Deputy Maness crawled to a ditch and asked Deputy Satkiewicz for a tourniquet. Police officer Hueramo from the Island Lake Police Department had responded to the scene, and he dragged Deputy Maness about 200 feet to an opening in a fence.

¶ 9    When Deputy Satkiewicz had turned to run from the front door, she could hear shots coming through the door and glass breaking. After being shot in the leg as she neared the fence by the defendant's house, Deputy Satkiewicz fell but then got up to run. As she came to a roadway, she felt a bullet go by her head. She saw Deputy Maness running along the fence and saw him get shot in the leg. By the time she got to Deputy Maness's car, the firing had stopped. Deputy Satkiewicz said that she did not feel getting shot but that pieces of her leg were splattered onto her vest. She heard Deputy Maness calling for her to get a tourniquet and knew that he needed help. Officer Hueramo came and assisted Deputy Maness.

¶ 10    After the shooting stopped, the police set up a perimeter around the defendant's house. The defendant was arrested later that evening as he was walking toward Crystal Lake near Smith Road and Route 176. The police then questioned him at the McHenry County Government Center. The defendant stated that he believed that the people he shot were intruders. He stopped shooting once he realized that they were police. He fled the scene because he was scared that he would be killed.

¶ 11    On November 6, 2014, the defendant was charged with six counts of attempted murder (720 ILCS 5/9-1(a)(1), (b)(1), 8-4(a) (West 2014)) for shooting at Deputies Maness, Satkiewicz, and Luna. He was also charged with two counts of aggravated battery (*id.* § 12-3.05(e)(2)(i)) and five counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)).

¶ 12    On April 2, 2015, the State filed an amended indictment. As pertinent to this appeal, the State replaced one count that alleged that the defendant had attempted to murder Deputy Satkiewicz "by shooting and causing severe bodily harm" with two counts that alleged that the defendant had attempted to murder Deputy Satkiewicz "by shooting her in the leg causing severe bodily harm" (count III) and "by shooting her in the chest causing severe bodily harm" (count

IV). On April 22, 2015, the State filed a second amended indictment in which count IV was amended to remove the language regarding causation of severe bodily harm.

¶ 13    Between April 27 and April 30, 2015, the trial court conducted a jury trial on the charges against the defendant. At the close of the trial, the jury found the defendant guilty of all charges. The trial court subsequently denied defense counsel's motion for a new trial as well as the defendant's *pro se* motion for a new trial.

¶ 14    On June 25, 2015, following a sentencing hearing, the trial court sentenced the defendant on five counts of attempted murder. The trial court sentenced the defendant to two concurrent terms of 55 years' imprisonment for his attempted murder of Deputy Maness, two concurrent terms of 55 years' imprisonment for his attempted murder of Deputy Satkiewicz, and 25 years' imprisonment for his attempted murder of Deputy Luna. The trial court otherwise ordered the sentences to run consecutively. Thus, the defendant was sentenced to a total of 135 years' imprisonment. The trial court found that it could not enter sentences on any of the other charges under one-act, one-crime principles. Following the trial court's ruling, the defendant filed a timely notice of appeal.

¶ 15                                    II. ANALYSIS

¶ 16                    A. Sufficiency of the Evidence as to Deputy Luna

¶ 17    The defendant's first contention is that he was not proved guilty beyond a reasonable doubt of the attempted murder of Deputy Luna, because the evidence failed to establish that the defendant either had the specific intent to kill Deputy Luna or knowingly fired a weapon in Deputy Luna's direction. The defendant insists that the evidence showed that shots were fired only in the direction of Deputies Satkiewicz and Maness and that Deputy Luna had been on the side of the house when the shooting began. After the shooting began, Deputy Luna came toward

the front of the house and took cover behind vehicles parked in the driveway. As Deputy Luna was not injured and there was no evidence that any shots were fired in his direction, the defendant insists, the evidence failed to establish that he attempted to murder Deputy Luna.

¶ 18    It is not the province of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is whether, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The sufficiency of the evidence and the relative weight and credibility to be given the testimony of the witnesses are considerations within the exclusive jurisdiction of the fact finder." *People v. Atherton*, 406 Ill. App. 3d 598, 608 (2010). The evaluation of the testimony and the resolution of any conflicts or inconsistencies that appear are also wholly within the province of the finder of fact. *Collins*, 106 Ill. 2d at 261-62. Nonetheless, where the record leaves a reasonable doubt, a reviewing court must reverse the judgment. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). A court of review has a duty to carefully review the evidence and to reverse the conviction of the defendant when the evidence is so unsatisfactory as to raise a serious doubt of the defendant's guilt. *People v. Estes*, 127 Ill. App. 3d 642, 651 (1984).

¶ 19    To support a conviction of attempted murder, the State must establish beyond a reasonable doubt that (1) the defendant performed an act constituting a "substantial step" toward the commission of murder (720 ILCS 5/8-4(a) (West 2014)) and (2) the defendant possessed the specific intent to kill the victim (*id.* § 9-1(a)(1)). *People v. Green*, 339 Ill. App. 3d 443, 451 (2003). Because intent is difficult to establish with direct evidence, the specific intent to kill may be, and normally is, inferred from the surrounding circumstances, such as (1) the character of the

attack, (2) the use of a deadly weapon, and (3) other matters from which an intent to kill may be inferred. *Id.* " 'Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life.' " *Id.* (quoting *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986)). While the act of firing a gun, without more, is not sufficient to prove the specific intent to kill, circumstances demonstrating that the defendant acted with malice or a complete disregard for human life when he discharged a firearm at another person support the conclusion that the defendant possessed the specific intent to kill. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39. The fact that the defendant failed to strike anyone "could support an inference that he lacked the intent to kill. However, that fact also supports the alternative inference that [the defendant] was simply unskilled and missed his targets. The decision as to which of competing inferences to draw from the evidence is the responsibility of the trier of fact." *Green*, 339 Ill. App. 3d at 451-52.

¶ 20 Based on the standard set forth in *Green*, we believe that the State presented sufficient evidence for a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt of the attempted first-degree murder of Deputy Luna. The defendant clearly intended to kill Deputies Maness and Satkiewicz when he used a rifle to shoot them though his front door. The defendant's words and actions also demonstrated that his intent to kill was not limited to Deputies Maness and Satkiewicz but also included Deputy Luna. Deputies Maness and Satkiewicz did not fire any shots at the defendant. Deputy Luna, however, shot at him eight times. The jury could therefore reasonably infer that the defendant's comment, "I hope you're ready to die 'cause I am," which was made after several shots had been fired at the defendant, was directed toward Deputy Luna. The evidence also showed that the defendant fired numerous

times down his driveway, near where Luna was positioned. Although all of the defendant's shots missed Deputy Luna, poor marksmanship is not a defense to attempted murder. *Id.* at 452.

¶ 21 The defendant insists that, based on his military training, he was a good marksman and could have hit Deputy Luna had he wanted to. Relying on *People v. Jones*, 184 Ill. App. 3d 412, 430 (1989), *People v. Thomas*, 127 Ill. App. 2d 444, 456 (1970), and *People v. Garrett*, 216 Ill. App. 3d 348, 354 (1991), the defendant argues that, because he had the opportunity to kill Deputy Luna but did not, he demonstrated that he lacked the requisite intent to commit attempted first-degree murder. We disagree. In *Jones*, *Thomas*, and *Garrett*, the defendant had a clear opportunity to kill the victim, yet chose not to do so. *Jones*, 184 Ill. App. 3d at 430 (reviewing court reversed attempted murder conviction where defendant hit victim in the head with the gun and kicked him in the head, but did not use the gun to murder him); *Thomas*, 127 Ill. App. 2d at 455-56 (conviction of attempted murder reversed where defendant had opportunity to kill victim but did not); *Garrett*, 216 Ill. App. 3d at 354 (reversing conviction of attempted murder where defendant, although armed, did not use weapon on victim). Again, whether the defendant intended to strike Deputy Luna was within the purview of the jury. *Green*, 339 Ill. App. 3d at 451-52. We note that Deputy Luna did not make himself an easy target to hit as he was moving around and hiding behind vehicles. The fact that Deputy Luna was not shot by the defendant did not establish that the defendant did not try to shoot him. *Id.* at 452.

¶ 22 We also find unpersuasive the defendant's reliance on *People v. Wagner*, 189 Ill. App. 3d 1041 (1989), *overruled on other grounds by People v. Mitchell*, 241 Ill. App. 3d 1094 (1993), and *People v. Trinkle*, 68 Ill. 2d 198 (1977). In *Wagner*, the defendant shot a gas station attendant during a robbery. *Wagner*, 189 Ill. App. 3d at 1043. Although the trial court found that the defendant did not have the specific intent to kill, it nonetheless convicted him of

attempted first-degree murder. The reviewing court reversed the defendant's conviction, finding that, absent the intent to kill, he could not be found guilty of attempted murder. *Id.* at 1046. In *Trinkle*, the defendant shot at a tavern from the outside after he was refused service, and the bullet struck a patron inside. *Trinkle*, 68 Ill. 2d at 199. The Illinois Supreme Court concluded that the defendant could not be found guilty of attempted murder, because he did not act with the specific intent to kill when he fired at the building. See *id.* at 202-03. Here, unlike in *Wagner* and *Trinkle*, there was evidence that the defendant did act with the specific intent to kill. The defendant told Deputy Luna that he hoped he was ready to die and fired shots in his direction. That was enough to establish that he acted with the requisite intent. See *People v. Johnson*, 331 Ill. App. 3d 239, 251 (2002) ("[e]vidence that a defendant discharged a firearm in the direction of another individual, either with malice or total disregard for human life, is sufficient to support a conviction for attempted first degree murder"); *People v. Sowewimo*, 276 Ill. App. 3d 330, 341 (1995) (firing even one shot at another person can be sufficient to demonstrate intent to kill for attempted first-degree murder).

¶ 23                                    B. *Krankel* Inquiry

¶ 24     The defendant's second contention on appeal is that the trial court did not follow the proper procedures set forth in *Krankel*, 102 Ill. 2d at 187-89, when he filed a *pro se* motion arguing that he had received the ineffective assistance of counsel. Relying on *People v. Jolly*, 2014 IL 117142, and *People v. Fields*, 2013 IL App (2d) 120945, the defendant argues that this court must vacate the trial court's ruling on his *pro se* motion and remand for further proceedings.

¶ 25     After the defendant was found guilty by the jury, defense counsel filed a motion for a new trial. The trial court denied that motion. The defendant then filed a *pro se* motion for a new

trial. He reiterated much of defense counsel's posttrial motion but added numerous allegations of ineffective assistance of counsel as well as other errors not previously alleged by counsel.

¶ 26    On June 5, 2015, when the defendant's *pro se* motion was first presented to the trial court, the prosecutor stated:

> "Judge, it appears most of this was a cut and paste of what [defense counsel] filed. And so we—I am not going to waste the court's time. We already addressed that. You already ruled upon that. And I ask that you stay consistent with your ruling.
>
> Judge, he then goes on to essentially make allegations against [defense counsel]. And I think the court, as the trier of these proceedings, can make an independent assessment of their ability and the defense that they put on. I believe that he did receive adequate representation.
>
> There [*sic*] were matters of trial strategy."

The prosecutor argued one particular claim made by the defendant, regarding the video of his postarrest statement, but the trial court interjected, stating, "I don't mean to cut you off or interrupt you. I agree with you."

¶ 27    On June 12, 2015, the trial court conducted a hearing on the defendant's motion. The State did not participate in the hearing. At the close of the hearing, the trial court denied the defendant's motion.

¶ 28    The purpose of a *Krankel* proceeding "is to facilitate the trial court's full consideration of a defendant's *pro se* claims of ineffective assistance of trial counsel and thereby potentially limit issues on appeal." *Jolly*, 2014 IL 117142, ¶ 29. There are three ways in which the trial court may conduct a preliminary *Krankel* hearing: (1) the court may ask defense counsel about the defendant's claims and allow counsel to "answer questions and explain the facts and

circumstances surrounding" the claims, (2) the court may have a "brief discussion" with the defendant about his claims, or (3) the court may base its evaluation "on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *People v. Buchanan*, 2013 IL App (2d) 120447, ¶ 19. "[T]he State should never be permitted to take an adversarial role against a *pro se* defendant at the preliminary *Krankel* inquiry." *Jolly*, 2014 IL 117142, ¶ 38. Because a defendant is not appointed new counsel for the preliminary *Krankel* inquiry, the State's participation, if any, should be *de minimis*. *Id.* If the trial court determines that the claims lack merit or pertain to trial strategy, the trial court may deny the *pro se* motion. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). However, if the allegations show possible neglect of the case, new counsel should be appointed to assist in the motion. *Id.* at 78. The manner in which the trial court conducted its *Krankel* inquiry is reviewed *de novo*. *Fields*, 2013 IL App (2d) 120945, ¶ 39.

¶ 29    In *Jolly*, the State conceded that the trial court erred in permitting the State's adversarial participation in the preliminary inquiry. *Jolly*, 2014 IL 117142, ¶ 27. Thus, the *Jolly* court addressed whether the error was harmless beyond a reasonable doubt and concluded that it was not. *Id.* ¶¶ 31, 40. During the preliminary inquiry in *Jolly*, the trial court "permitted the State to question defendant and his trial counsel extensively in a manner contrary to defendant's *pro se* allegations of ineffective assistance of counsel and to solicit testimony from his trial counsel that rebutted defendant's allegations." *Id.* ¶¶ 20-21, 40. In addition, the State "presented evidence and argument contrary to defendant's claims and emphasized the experience of defendant's trial counsel." *Id.* ¶ 40. The supreme court therefore reversed the denial of the defendant's posttrial motion and remanded for a new preliminary *Krankel* hearing. *Id.* ¶ 48.

¶ 30    In *Fields*, at the preliminary *Krankel* hearing, the trial court permitted the State to argue against, or otherwise rebut, each of the defendant's claims of ineffective assistance of counsel. The State also argued in support of defense counsel's explanations of his actions at the defendant's trial. *Fields*, 2013 IL App (2d) 120945, ¶¶ 22, 41. This court found that the State should not be an active participant in a preliminary *Krankel* inquiry. Rather, we determined, the State should be limited to a *de minimis* role in the preliminary *Krankel* inquiry, to limit the risk that the inquiry would be transformed into an adversarial proceeding with both the State and defense counsel opposing the defendant. *Id.* ¶ 40. After reviewing the record, we concluded:

> "Where the trial court, at various times, allowed both defense counsel and the State to assert that defendant's claims warranted no further investigation, the hearing changed from one consistent with *Krankel* and its progeny to an adversarial hearing where defendant, without waiving his right to be represented, was forced, unrepresented, to argue the merits of his claims." *Id.* ¶ 41.

Thus, we reversed the denial of the defendant's motion and remanded for a new preliminary inquiry before a different judge and without the State's adversarial participation. *Id.* ¶ 42.

¶ 31    Here, unlike in *Jolly* and *Fields*, the State did not take an adversarial role in the *Krankel* hearing that the trial court conducted. Rather, the State's participation was limited to statements made one week prior to the hearing, when it informed the trial court that it considered the defendant's complaints against his attorney to be on matters of trial strategy. The defendant argues that this comment warrants a new hearing on his motion because the comment improperly biased the trial court against him. We disagree. The State's comment rose only to the level of *de minimis*, which our supreme court has found to be permissible. See *Jolly*, 2014 IL 117142, ¶ 38.

¶ 32                    C. Jury Questioning Pursuant to *Zehr*

¶ 33    The defendant's third contention on appeal is that he was deprived of a fair trial before an impartial jury when the trial court improperly phrased the final question it asked the jury under *Zehr*. The defendant argues that the trial court's improper phrasing caused the jurors to be biased against him when he chose not to exercise his right to testify. The State responds that the defendant has forfeited this issue because he did not raise it at trial.

¶ 34    To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion. *People v. Belknap*, 2014 IL 117094, ¶ 66. Failure to do either results in forfeiture. There is, however, a well-established exception to that principle. Illinois Supreme Court Rule 615(a) provides that insubstantial errors "shall be disregarded" but that substantial or what have become known as plain errors "may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). As the language of the rule indicates, a reviewing court may exercise discretion and excuse a defendant's procedural default. *People v. Clark*, 2016 IL 118845, ¶ 42. Our supreme court has traditionally identified two instances when it is appropriate to do so: "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 35    The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial. *Id.* ¶ 49. Here, the parties dispute whether the

trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). That rule requires the trial court to ask potential jurors whether they understand and accept the four *Zehr* principles. See *id.* The *Zehr* principle at issue is that the defendant has the right not to testify. The trial court conveyed this information to the jurors by questioning them whether they accepted that it could not be held against the defendant if he "fails" to testify. The defendant insists that the trial court's use of the word "fails" had a negative connotation as it conveyed to the jury that the defendant was not doing something that he should have been doing. The State counters that, in context, the trial court's use of that term was not inappropriate. The State also maintains that the trial court's question was sufficient as the court did not have to use any particular language to convey the *Zehr* principles. See *People v. Blankenship*, 406 Ill. App. 3d 578, 583 (2010).

¶ 36 We agree with the State. In questioning the jury, the trial court explained that "every defendant has a constitutional right not to testify and the jury may not draw any inference of guilt if the defendant fails to testify." In context, we believe, the trial court was informing the jury that the defendant was exercising his constitutional right if he failed to testify. The trial court's phrasing of this question was not improper as it was consistent with *Zehr*.

¶ 37 However, even if we were to construe the trial court's use of the term "fails" as error, such an error does not rise to the level of plain error. Under the two-prong plain error analysis, only the first prong—that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice—can apply unless the defendant can demonstrate that the trial court's error caused the jury to be biased. *Sebby*, 2017 IL 119445, ¶ 52 ("A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury."). Here, the defendant does nothing more than

speculate that the trial court's instruction might have biased the jury against him. Thus, the second prong of the plain error analysis is not applicable.

¶ 38    As to the first prong of the plain error analysis, the defendant argues that the evidence in this case was closely balanced. The defendant restates his first contention—that his intent to kill Deputy Luna was not clear, because he did not even realize that Deputy Luna was on his property. The defendant also argues that the evidence was closely balanced as to whether he intended to shoot Deputy Satkiewicz in the chest, as the bullet that struck her there might have ricocheted from one that hit her in the leg.

¶ 39    The evidence in this case was not closely balanced. The defendant clearly shot at all three deputies, and his intent to kill them could be readily inferred from the circumstances. As previously discussed, the defendant's act of shooting toward Deputy Luna while stating that he hoped he was "ready to die" clearly showed the defendant's intent to kill Deputy Luna. Further, in light of the defendant's statement when he started shooting ("let's do this") and his repeated shots at Deputies Maness and Satkiewicz as they were trying to flee, there was ample evidence of his intent to kill them. That the defendant might not have intended to strike Deputy Satkiewicz in her chest in no way diminishes his potentially lethal conduct directed toward the deputies.

¶ 40                    D. Constitutional Right to Be Present at Trial

¶ 41    The defendant's fourth contention on appeal is that his constitutional right to be present at all critical stages of the trial was violated when the trial court ordered him to be removed from the courtroom on the second day of trial after he loudly complained about needing to see a doctor.

¶ 42    In response, the State argues that the defendant's behavior throughout the proceedings shows that he consistently faked or exaggerated his ailments.  The State points to a January 2015 psychological evaluation, which indicated that the defendant had a tendency to complain and magnify illness.  The State also notes that, prior to trial, the defendant was using a wheelchair even though he did not need to.  The State therefore filed a motion for the defendant to be required to walk into the courtroom rather than be brought in by a wheelchair.

¶ 43    At a hearing on that motion, Deputy McKenzie testified that he arrested the defendant on October 16, 2014, the day of the shooting.  The defendant was walking along the road and did not appear to be limping.  Dr. Kim, who provided care for the defendant at the McHenry County jail, testified that he had examined the defendant several times, including after the defendant had fallen in the shower and complained of knee pain.  Dr. Kim took X-rays, which revealed no acute injury.  In examining the defendant, he found nothing that would limit the defendant's mobility to the extent that he should be in a wheelchair full-time.  Dr. Kim told the defendant many times that, if he continued to use a wheelchair, his leg muscles would atrophy and that would make it more likely that he would need a wheelchair in the future.  At the conclusion of the hearing, the trial court ordered that the defendant be given a cane or walker for the purposes of entering and leaving the courtroom.

¶ 44    On the morning of April 29, 2015, the day at issue, the defendant was found lying on the floor of his jail cell when officers arrived to get him dressed in street clothes and take him to court for that day's trial proceedings.  The defendant was screaming about pain, and he resisted efforts by the officers to get him into a wheelchair and get him changed for court. When officers were unable to get him to settle down or get him dressed, they called the jail nurse.  The defendant, accompanied by a couple of the officers and the nurse, was later wheeled into the

courtroom outside the presence of the jury. The trial court then conducted a hearing to determine whether the defendant was unable to attend the trial due to a medical problem.

¶ 45    Nurse McKay stated that she was a registered nurse with the jail and that she had examined the defendant that morning. She had received a note that the defendant was acting ill. She examined the defendant's abdomen and found no medical problems, other than a hernia, which the defendant had had for some time. She believed that he had been trying to force himself to vomit, which might have made his muscles tender. She examined the garbage can in his cell and found no evidence that he had vomited. She found no medical evidence that would explain the defendant's behavior that morning.

¶ 46    After hearing McKay's testimony, defense counsel stated that he believed that the defendant was feigning illness and that he was ready to proceed with trial. The trial court then stated that it believed that the defendant was faking an illness and that his behavior constituted a refusal to participate that would waive his constitutional right to be present. While the trial court was making its comments, the defendant interrupted it eight times, arguing that he needed to see a doctor. The defendant was removed from the courtroom.

¶ 47    Eight witnesses then testified that morning in the defendant's absence. After the lunch recess, the State informed the trial court that there were two videos from the jail that morning that showed the defendant "feigning" illness. Portions of the videos were then played and narrated by the prosecutor. After viewing those videos, the trial court reiterated its finding that the defendant's behavior was "absolutely totally unacceptable [and] was in no way attributable to any illness." The trial court then found that, as the defendant was now "calm and collected," the trial would proceed with him present.

¶ 48    As the defendant acknowledges, he did not raise this issue at trial or in a posttrial motion. Thus, the defendant is not entitled to any relief unless we find that the trial court's decision to continue the trial in his absence constituted plain error. See *Belknap*, 2014 IL 117094, ¶ 66.

¶ 49    A defendant has a fundamental right to be present during the testimony of witnesses against him, which implicates a defendant's sixth amendment confrontation rights. *People v. Escalante*, 256 Ill. App. 3d 239, 245 (1994). A defendant can, however, waive his right to be present by being voluntarily absent. See *People v. Smith*, 188 Ill. 2d 335, 341 (1999). Furthermore, a defendant can lose his right to be present if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. *Illinois v. Allen*, 397 U.S. 337, 343 (1970). A trial court's decision to continue the trial in the defendant's absence will not be disturbed absent an abuse of discretion. *Id.* ("[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."); see also *People v. Justice*, 349 Ill. App. 3d 981, 988 (2004) (trial court's decision to accept a defendant's waiver of his right to be present is reviewed under the abuse-of-discretion standard).

¶ 50    Here, we do not believe that the trial court abused its discretion when it continued the trial in the defendant's absence. Although the defendant insisted that he was in too much pain to attend his trial, McKay contradicted his protests, stating that she had examined the defendant and found nothing wrong with him other than a preexisting hernia condition. That condition, however, would not explain his laments of pain. As such, she essentially concluded that the defendant was exaggerating any pain he was in. Such a conclusion would be consistent with the

defendant's psychological evaluation that indicated a tendency to exaggerate his level of pain. Such a conclusion would also be consistent with Dr. Kim's testimony from an earlier hearing that there was no medical support for the defendant's claim that he needed to use a wheelchair to attend the court proceedings. Based on all of this evidence, the trial court did not abuse its discretion in determining that the defendant was physically able to attend the trial and that his insistence to the contrary reflected his voluntary decision not to be there. Accordingly, we find no error, much less any plain error.

¶ 51 The defendant insists that we need not defer to the trial court's credibility determination regarding McKay's testimony, because this court can review the DVD of the morning in question that shows the defendant's protruding hernia and reflects how much pain he was in. We reject this argument for two reasons. First, we review the trial court's decision based on what the trial court had before it at the time. See *Palmros v. Barcelona*, 284 Ill. App. 3d 642, 645 (1996) (reviewing court will not consider evidence not before the trial court). The trial court did not have the DVD at that time. Because the trial court did not have access to that DVD, that recording cannot now be used to find that the trial court abused its discretion in determining that the defendant had waived his right to be present.

¶ 52 Second, even if we were to engage in such an analysis, we would not disturb the trial court's decision. The DVD does not conclusively establish how much pain the defendant was in. To rely exclusively on the DVD would require this court to overlook McKay's testimony as well as the other evidence that the defendant had a propensity for feigning illness and exaggerating his pain. That we decline to do.

¶ 53 We also note that the defendant claims that his attorney had no right to waive the defendant's presence at trial. Although that is true (*People v. Mallett*, 30 Ill. 2d 136, 142

(1964)), that principle is not relevant to the case at bar. Here, it was the defendant's actions alone—not his attorney's—that caused him to be absent from his trial.

¶ 54                                    E. Prosecutorial Comments

¶ 55    The defendant's fifth contention on appeal is that he was deprived of a fair trial when the State made improper statements during closing argument.

¶ 56    At the close of the evidence, the prosecutor argued: "I think everybody in this courtroom knows how I feel, but now it's your turn." He then described the defendant as "John Wayne over here draped in the American flag" and told the jurors that Deputy Maness gave his "full measure of devotion to you *** [in the] blood he spilled in the service of the line of duty." He showed the jurors Deputy Satkiewicz's vest, telling the jurors that she was shot in the chest through the house door. Referring to the defendant's statement to the police that he thought that he was shooting at intruders, the prosecutor called the defendant a "lying liar" and argued that the defendant was "lying through his teeth. He's minimizing, he's fabricating, he's fibbing. He's a lying liar. That's what he is. Don't believe a word he says." He argued that the defendant shot in Deputy Luna's direction, saying, "That's not that big of a driveway, folks. *** He's right in the line of fire."

¶ 57    In his closing argument, defense counsel concluded his remarks by saying:

> "I'm going to ask you to carefully review all of this. This is a lot. I understand this. But carefully review this. Examine all the photographs, all of these photographs, everything. *** Look at all the physical evidence that you're provided right now before you come to your conclusion. Listen again to testimony. Go through that video again that you saw.

And after you received the jury instructions from the judge and the judge asks you to go and deliberate, I ask that you hold the prosecution to their burden. Hold them to it and return a verdict of not guilty."

¶ 58    In rebuttal, the prosecutor began his comments by stating:

"Just because they tell you something is significant, because they tell you to comb through this evidence over and over again. You don't have to if you don't want to, ladies and gentlemen.

Ladies and gentlemen, this one is not even close. The wealth of evidence, the mountains of evidence we've presented points only one way; that's guilty."

The prosecutor added, "we didn't select 14 dummies." He told the jurors that the defendant shot Deputy Satkiewicz in the chest, saying "you saw the vest," and he argued that the defendant "kept tracking" the deputies.

¶ 59    In *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007), our supreme court stated:

"Prosecutors are afforded wide latitude in closing argument. [Citation.] In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. [Citation.] Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction. [Citation.] If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. [Citation.]"

As the defendant did not object to any of the State's comments at trial or specifically complain about any of them in his posttrial motion, we consider only whether those comments constituted plain error. See *People v. Johnson*, 220 Ill. App. 3d 550, 560-61 (1991).

¶ 60 We believe that two of the prosecutor's comments that the defendant complains about were improper. First, the prosecutor's comment, "I think everybody in this courtroom knows how I feel," reflects a personal opinion that our courts have repeatedly denounced as improper. See *People v. Emerson*, 122 Ill. 2d 411, 434 (1987). Second, the prosecutor's statement that Deputy Maness "spilled blood" in the line of duty was improper as it appealed to the jury's sympathy for the victim, particularly based on his status as a police officer. See *People v. Rebecca*, 2012 IL App (2d) 091259, ¶ 83 (remark improper where sole purpose was to evoke sympathy for victim). Nonetheless, although we consider the above remarks intemperate and improper, the record indicates that the jury was instructed to consider only the evidence at trial and to disregard any statements made in closing argument that were not based on the evidence. In view of the entire record and the overwhelming evidence of defendant's guilt, we cannot say that the two improper comments either constituted a material factor in the defendant's convictions or otherwise deprived him of a fair trial. See *People v. Johnson*, 114 Ill. 2d 170, 199 (1986).

¶ 61 The other comments that the defendant complains about were not improper. The prosecutor's sarcastic description of the defendant as "John Wayne *** draped in the American flag" was within the latitude afforded prosecutors. See *People v. Banks*, 237 Ill. 2d 154, 183 (2010) ("The wide latitude extended to prosecutors during their closing remarks has been held to include some degree of both sarcasm and invective to express their points."). The prosecutor's comments that the defendant shot in the direction of Deputy Luna and that Deputy Satkiewicz

was shot in the chest were all fair characterizations of the evidence. See *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 239 (prosecutor may comment on the evidence and any fair, reasonable inferences).

¶ 62    We also find without merit the defendant's argument that, because he did not testify at trial, it was improper for the State to comment on his credibility. Our supreme court has rejected a similar argument. See *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000); *People v. Hudson*, 157 Ill. 2d 401, 443 (1993). In neither *Kirchner* nor *Hudson* did the defendant testify. *Kirchner*, 194 Ill. 2d at 516; *Hudson*, 157 Ill. 2d at 421-22. In closing argument, the State accused the defendant of trying to misdirect and " 'dupe' " the jury (*Kirchner*, 194 Ill. 2d at 550) or presenting a " 'laughable' " defense (*Hudson*, 157 Ill. 2d at 442). The supreme court held that the State's comments were not improper, because the State may challenge the credibility of a defendant and the defendant's theory of defense when there is evidence to support such a challenge. *Kirchner*, 194 Ill. 2d at 549; *Hudson*, 157 Ill. 2d at 443.

¶ 63    Here, in his statement to the police following his arrest, the defendant indicated that he did not know that the people he shot at were police officers. This was contradicted by Deputy Maness's and Deputy Satkiewicz's testimony that they identified themselves as police officers when they first encountered the defendant. It was in response to the defendant's statement that the prosecutor asserted that the defendant was a "lying liar." As the prosecutor's argument was a fair inference from the evidence, it was not improper. See *Kirchner*, 194 Ill. 2d at 549; *Hudson*, 157 Ill. 2d at 443; see also *People v. Manley*, 222 Ill. App. 3d 896, 910 (1991) (it is not improper for the prosecutor to call the defendant a "liar" if conflicts in the evidence make such an assertion a fair inference).

¶ 64 In so ruling, we find unpersuasive the defendant's reliance on this court's decision in *People v. Mpulamasaka*, 2016 IL App (2d) 130703. In that case, we found that the State had engaged in prosecutorial misconduct by (1) using the alleged victim's learning disability to confuse the jury as to whether she had consented to sexual contact with the defendant, (2) repeatedly referring to the defendant as a predator, (3) denigrating the defense expert, (4) misstating the testimony of the State expert, (5) accusing defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception, (6) telling the jury to disregard the alleged victim's cross-examination that was favorable to the defendant, and (7) sitting in the witness chair to argue that the alleged victim was courageous while also discussing the defendant's credibility. *Id.* ¶¶ 107-13. As to the last point, we stated:

> "[D]efense counsel said in his opening statement that defendant would testify. Defendant later decided that he would not testify. Whether intentionally or not, by arguing [the alleged victim's] courage and then transitioning to defendant's credibility, the prosecutor might have reminded the jury that defendant did not testify, especially when the argument was made from the witness chair. Indeed, the most troubling aspect of the prosecutor's conduct was leaving the podium and sitting in the witness chair to argue the victim's credibility and courage and then discussing defendant's credibility. There is no question that this tactic was designed to evoke sympathy for [the alleged victim] and disgust for defendant." *Id.* ¶ 113.

¶ 65 Here, the prosecutor did not make any of the type of errors that we identified in *Mpulamasaka*. As most pertinent here, the prosecutor's statements did not call attention to the defendant's decision not to testify. When viewed in context, the prosecutor's description of the defendant as a "liar" was in response to the statement that the defendant gave to the police. As

explained above, that was not improper. See *Kirchner*, 194 Ill. 2d at 549; *Hudson*, 157 Ill. 2d at 443.

¶ 66     We also reject the defendant's argument that the State improperly argued in rebuttal that the jury did not have to look through all of the evidence. The defendant insists that the State's argument misstated the jury's obligation to consider all of the evidence before it. See *People v. Crossno*, 93 Ill. App. 3d 808, 822 (1981) (error for prosecutor to argue that jurors could believe only the prosecution witnesses).

¶ 67     Taken in context, the prosecutor's point was that the evidence of the defendant's guilt was so clear that reviewing everything "over and over again" was unnecessary. We believe that the State's argument was within the latitude afforded prosecutors. See *Wheeler*, 226 Ill. 2d at 123. Moreover, even if the comment was improper, the evidence was not closely balanced and thus the comment did not amount to plain error.

¶ 68     We also find that, because the evidence in this case was not closely balanced, and because the prosecutor's two improper comments had minimal impact, if any, on the jury, the cumulative effect of the prosecutor's comments did not deprive the defendant of a fair trial. See *People v. Minter*, 2015 IL App (1st) 120958, ¶ 80 (as trial court's errors had either a minor impact or no impact at all, defendant did not show that, taken together, they deprived him of a fair trial).

¶ 69                     F. Ineffective Assistance of Counsel

¶ 70     The defendant's final contention on appeal is that he was deprived of the effective assistance of counsel. Specifically, he contends that his trial counsel was ineffective for failing to (1) file a motion to dismiss one of the charges on speedy-trial grounds, (2) file a motion to suppress his statements to the police, (3) object to improper closing arguments by the

prosecution, (4) object to the trial court's phrasing of the fourth *Zehr* question, and (5) object to his removal from the courtroom when he was not physically able to be there.

¶ 71    In order to succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Enis*, 194 Ill. 2d 361, 376-77 (2000). The defendant must establish both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have differed. *People v. Little*, 335 Ill. App. 3d 1046, 1052 (2003). A reviewing court may dispose of an ineffectiveness claim on the prejudice prong alone by determining that the defendant was not prejudiced by counsel's representation. *People v. Munson*, 171 Ill. 2d 158, 184 (1996).

¶ 72    We first address the defendant's argument that his counsel was ineffective for failing to seek to dismiss, on speedy-trial principles, count IV of the amended indictment, charging the attempted first-degree murder of Deputy Satkiewicz. The defendant notes that, in the original indictment, he was charged with two counts of the attempted murder of Deputy Satkiewicz. Count III of that indictment alleged that he had shot Deputy Satkiewicz, causing severe bodily harm. In the amended indictment, count III alleged that he had shot Deputy Satkiewicz, causing severe bodily harm by shooting her in the leg; count IV alleged that he had shot Deputy Satkiewicz, causing severe bodily harm by shooting her in the chest. The defendant insists that, because no legitimate reason existed for not adding count IV and its factual basis to the original charging instrument, count IV had to be filed within 160 days of the original charges. Because it was not, the defendant argues that his counsel was ineffective for failing to move to dismiss that charge.

¶ 73    This issue involves the interrelationship between the speedy-trial rule (725 ILCS 5/103-5 (West 2014)) and the compulsory-joinder rule (720 ILCS 5/3-3 (West 2014)). The speedy-trial rule provides, in pertinent part, that every defendant on bail or recognizance shall be tried within 160 days from the date he or she demands trial unless delay is occasioned by the defendant. 725 ILCS 5/103-5(b) (West 2014); *People v. Hall*, 194 Ill. 2d 305, 326 (2000). "Any period of delay found to be occasioned by the defendant tolls the applicable statutory period." *Hall*, 194 Ill. 2d at 327. Under the compulsory-joinder rule, multiple charges against a defendant must be joined in a single prosecution if the following three conditions are satisfied: (1) the multiple charges are known to the prosecutor when the prosecution begins, (2) the charges are within the jurisdiction of a single court, and (3) the charges are based upon the same act. See 720 ILCS 5/3-3(b) (West 2014); *People v. Quigley*, 183 Ill. 2d 1, 7 (1998).

¶ 74    The rules for tolling the speedy-trial period are more complicated if the compulsory-joinder rule applies. As our supreme court has stated:

> " 'Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges. Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained.' " *People v. Phipps*, 238 Ill. 2d 54, 66 (2010) (quoting *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981)).

¶ 75    "In other words, when the compulsory-joinder rule applies, a delay that occurs on the original charge (or charges) and that is attributable to defendant will not toll the speedy-trial period as to a subsequent charge (or charges), if the delay occurred before the subsequent charge was filed because the subsequent charge was not before the court when the delay occurred." *People v. Kazenko*, 2012 IL App (3d) 110529, ¶ 13.  In such a situation, it cannot be assumed that the defendant would have agreed to the delay if the new charge had been pending.  *Phipps*, 238 Ill. 2d at 67.

¶ 76    This issue hinges on whether the attempted first-degree murder charges alleging that the defendant shot Deputy Satkiewicz in the chest and the leg were new and additional charges to the original attempted first-degree murder charge alleging that the defendant shot Deputy Satkiewicz causing severe bodily harm.  We review *de novo* the question of whether a subsequently filed charge is considered "new and additional" under the rule in *Phipps*.

¶ 77    In *Phipps*, our supreme court observed that the purpose of the rule is to prevent trial by ambush:

   "[T]he rule, therefore, centers on whether the defendant had adequate notice of the subsequent charges to allow preparation of a defense.  The focus is on whether the original charging instrument gave the defendant sufficient notice of the subsequent charges to prepare adequately for trial on those charges.  If the original charging instrument gives a defendant adequate notice of the subsequent charges, the ability to prepare for trial on those charges is not hindered in any way.  Thus, when the State files the subsequent charge, the defendant will not face 'a Hobson's choice between a trial without adequate preparation and further pretrial detention to prepare for trial.' [Citation.]  Rather, the defendant may proceed to trial on the subsequent charges with

adequate preparation instead of being forced to agree to further delay. In those circumstances, the rationale for declining to attribute to the defendant delays in connection with the original charges does not apply." *Id.* at 67-68.

¶ 78 *Phipps* found that the original indictment and the subsequent charging instrument in that case alleged the same conduct—that the defendant drove a motor vehicle under the influence of alcohol and collided with another vehicle, causing the death of the victim. *Id.* at 68. The original indictment thus provided the defendant with the material allegations of the subsequent information. The court also found it significant that the two charges to be compared—reckless homicide and aggravated DUI—had essentially the same elements and provided the same penalty. *Id.* *Phipps* therefore concluded that the aggravated DUI charge was not "new and additional" for speedy-trial purposes. Thus, any delays attributable to the defendant on the reckless homicide charge were also attributable to him on the subsequent charge of aggravated DUI, and consequently no speedy-trial violation occurred. *Id.* at 70.

¶ 79 We note that our supreme court recently discussed the issue of compulsory joinder in *People v. Staake*, 2017 IL 121755. In that case, the defendant was originally charged with second-degree murder. *Id.* ¶ 3. The State subsequently filed an amended information replacing the charge of second-degree murder with one of first-degree murder. *Id.* ¶ 4. On appeal, the defendant argued that the charge of first-degree murder was subject to compulsory joinder to the original charge. Because that charge was not timely filed, the defendant argued, it should be dismissed on speedy-trial grounds. *Id.* ¶ 28. The supreme court rejected the defendant's argument. The supreme court explained that both the original and amended charges alleged that the defendant had committed the identical conduct of killing the victim with a knife. *Id.* ¶ 40. Both charges also involved the same elements, as second-degree murder was not a lesser

included offense of first-degree murder but rather "a lesser mitigated offense."  The supreme court therefore concluded that the amended information was not improper, because the original information provided the defendant notice of the material allegations in the subsequent amendments. *Id.*

¶ 80    Here, the amended indictment did not include "new and additional" charges.  Rather, the amended indictment just provided more specificity.  Instead of alleging that the defendant had shot Deputy Satkiewicz "causing severe bodily harm," the amended indictment alleged that the defendant had shot Deputy Satkiewicz "causing severe bodily harm" by shooting her "in the leg" (count III) and "in the chest" (count IV).  The amended charges did not involve a different statute or add any elements.  Moreover, the defendant cannot successfully claim that the amended indictment created a "trial by ambush."  The defendant was aware that he was being charged with shooting Deputy Satkiewicz.  His defense was that he believed that he was shooting at an intruder, not a police officer.  The fact that the State specified where the defendant shot Deputy Satkiewicz had no bearing on his defense.  *Id.* ¶ 42 (defendant not subject to trial by ambush where amended information had no impact on theory of self-defense).

¶ 81    We conclude that the amended indictment did not include any new and additional charges.  The amended indictment therefore related back to the original indictment, and any delays attributable to the defendant on the initial charges are also attributable to him on the amended charges.  The defendant does not argue any other basis for a speedy-trial violation in this case.  Thus, as no error occurred, defense counsel was not ineffective for failing to file a motion to dismiss on speedy-trial grounds.  See *id.* ¶ 46; see also *People v. Givens*, 237 Ill. 2d 311, 331 (2010) (counsel's failure to file a motion does not demonstrate incompetent representation when the motion would have been futile).

¶ 82    We next turn to the defendant's argument that his counsel was ineffective for not filing a motion to suppress the defendant's statements as based on a *Miranda* violation.  The defendant contends that such a motion would have been successful because he did not sign a *Miranda* waiver and his statements were made only after he said that he could not afford a lawyer.  The defendant's argument is contrary to United States Supreme Court precedent.  See *Davis v. United States*, 512 U.S. 452, 459 (1994); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

¶ 83    In *Butler*, the Supreme Court held that whether a defendant has waived his *Miranda* rights must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.  *Butler*, 441 U.S. at 373-74. The Supreme Court explained that, although an express written or oral statement of waiver is strong proof of the validity of a waiver, it is not necessary to establish a waiver.  *Id.* at 373.  In *Davis*, the Supreme Court held that police may continue questioning a suspect until he clearly requests an attorney.  *Davis*, 512 U.S. at 459.

¶ 84    Here, when informed of his *Miranda* rights, the defendant stated that he could not afford an attorney.  The defendant then proceeded to answer the officer's questions.  The defendant's statement was not a clear and unequivocal request for an attorney and thus was insufficient to invoke his *Miranda* rights.  See *id.*; see also *Lord v. Duckworth*, 29 F.3d 1216, 1220-21 (7th Cir. 1994) (the question, "I can't afford a lawyer but is there any way I can get one?" lacked the clear implication of a present desire to consult with counsel and thus was not an unequivocal request for counsel).  Therefore, the defendant's subsequent statements were not given in violation of *Miranda*.  *Davis*, 512 U.S. at 459.  Further, as the circumstances indicate that the defendant's statements were knowing and voluntary, the lack of a written waiver of his *Miranda* rights does not establish that he did not waive those rights.  *Butler*, 441 U.S. at 373.  Accordingly, as the

record indicates that the defendant did waive his *Miranda* rights, defense counsel was not ineffective for not filing a motion to suppress the defendant's statements as based on a *Miranda* violation. *Givens*, 237 Ill. 2d at 331.

¶ 85 The defendant also claims that his counsel was ineffective for not objecting to (1) improper prosecutorial comments, (2) the trial court's phrasing of the *Zehr* question regarding his decision not to testify, and (3) his physical removal from court when he was in too much pain to be there. However, as we have already addressed those underlying issues and found no reversible error, defense counsel was not ineffective for failing to make those objections. *Munson*, 171 Ill. 2d at 184. Moreover, as we find that defense counsel's representation did not constitute ineffective assistance as to any individual issue, we do not believe that the cumulative effect of defense counsel's representation deprived the defendant of a fair trial. See *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002).

¶ 86                              III. CONCLUSION

¶ 87 For the reasons stated, the judgment of the circuit court of McHenry County is affirmed. As part of our judgment, we grant the State's request that the defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 88 Affirmed.