2025 IL App (2d) 2240627-U
No. 2-24-0627
Order filed November 6, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-1604 |
| ERROL O. SHAKES, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence was sufficient to prove beyond a reasonable doubt that the defendant possessed the intent to kill by repeatedly stabbing the victim with a paring knife, and the trial court did not abuse its discretion in imposing a sixteen-year sentence.

¶ 2    Defendant, Errol Shakes, argues two points of error in this appeal. The first is that the State failed to prove beyond a reasonable doubt that he possessed the specific intent to kill. Alternatively, defendant contends that the trial court abused its discretion by sentencing defendant to 16 years in prison upon his conviction for attempted first-degree murder. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On October 21, 2021, defendant, Errol Shakes, boarded a Pace Bus at the College of Lake Country in Grayslake. The bus, driven by Edward Nahf, was almost empty, and defendant took a seat at the rear. The bus proceeded along its route, stopping at the Libertyville Train Station, where the victim, Timothy Troutman, boarded. The victim made a beeline to defendant, addressing him by name. Over the next five minutes, the victim proceeded to taunt defendant repeatedly, calling him a "dumbass," "bitch," and a "motherfucker." The victim also made multiple references to a knife, asking defendant "wave any knives around lately? "Where's your little knife, bitch?" And "why don't you whip out your little knife, motherfucker?" Around this time, a brief physical altercation occurred, during which the victim either touched defendant or pushed his bag. Defendant finally responded, asking the victim why he got on the bus to "fuck with" him. The victim retorted, stating "I don't like you, motherfucker."

¶ 5      This apparently was defendant's breaking point. He rose to his feet and, wielding a 3-inch blade paring knife, stabbed down toward the victim approximately 20 times. The victim fell backward; his arms and legs raised in a defensive posture. Not all strikes made contact, but multiple strikes landed on the victim's arms, head, and torso. After approximately 24 seconds, defendant took a step backward, still wielding the knife in his raised arm. The victim, at this point bleeding heavily, screamed for help. Nahf, the bus driver, ordered the two to separate, and defendant proceeded toward the front of the bus. At this point, Nahf heard the defendant say "he [the victim] was fucking with me," (to the victim) "I didn't fuck with you. I'm gonna kill you, motherfucker," and (to Nahf) "I'll kill him." Defendant exited the bus. The victim followed, screaming that he had been stabbed, and leaving a trail of blood down the aisle.

¶ 6    Nahf stopped the bus and dialed 911. Meanwhile, surveillance video showed defendant bending down in the grassy area beside the bus stop sign and making a pushing motion into the ground. Later, police would recover the 3-inch paring knife from this area. Libertyville police officers Heyde and Baker were the first to arrive on scene. They observed defendant standing on the west side of the bus, and the victim staggering to the east, bleeding heavily. Officers applied tourniquets to the victims arms and called for paramedics, who arrived thereafter to transport the victim to Condell Hospital in Libertyville. Officers arrested defendant at the scene.

¶ 7    At the hospital, physicians observed the victim to have multiple stab wounds about the arms, chest, back, and head. The victim required surgery to treat two deep wounds near the elbows. Dr. Kristin Vercillo, the treating physician, testified that defendant would have died without medical intervention. The victim stayed in the hospital for six days, after which he was discharged into a nursing home.

¶ 8    On November 10, 2021, a Lake County Grand Jury indicted defendant on one count attempted first degree murder, a class X felony, in violation of 720 ILCS 5/9-1(a)(1) and 720 ILCS 5/8-4(a), and two counts of aggravated battery, class 3 felonies, in violation of 720 ILCS 5/12-3.05(a)(1). The parties proceeded to a bench trial on December 5, 2023, whereupon the trial court found defendant guilty of all three counts. The trial court merged the aggravated battery charges with the attempted murder charge, and sentenced defendant to sixteen years in prison, to be served at 85 percent, with credit for time served from October 21, 2021.

¶ 9                                II. ANALYSIS

¶ 10                        A. Proof Beyond a Reasonable Doubt

¶ 11   A criminal conviction will not be set aside unless the evidence is so improbable as to raise a reasonable doubt of the defendant's guilt. *People v. Vriner*, 74 Ill.2d 329, 342 (1978). When

faced with a challenge to the sufficiency of the evidence, it is not this court's role to re-try the defendant. Rather, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trial of fact could have found the essential elements of a crime beyond a reasonable doubt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). To sustain a conviction for attempted murder, the State must establish: (1) that the defendant performed an act which constitutes a "substantial step" towards the commission of the crime, and (2) that he possessed the criminal intent to kill the victim. *People v. Carroll*, 260 Ill.App.3d 319, 329 (1st Dist. 1992). Here, the defendant does not dispute that the State has carried its burden on the first element of the charge. Accordingly, we focus on whether the defendant possessed the requisite intent to kill his victim.

¶ 12　Because it is difficult to establish intent with direct evidence, the specific intent to kill may be inferred from the surrounding circumstances, such as (1) the character of the attack, (2) the use of a deadly weapon, and (3) other matters from which an intent to kill may be inferred. *People v. Peters*, 2018 IL App (2d) 150650, ¶ 19. "Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life." *People v. Winters*, 151 Ill.App.3d 402, 405 (2d Dist. 1986).

¶ 13　The circumstances of this case convince us that a rational trier of fact could have found defendant guilty of attempted murder. The weapon in this case was a 75 mm (3 inch) paring knife. Defendant argues that he owned this knife to cut food, not to use it as a weapon, and that one therefore cannot classify it as a "deadly weapon" the use of which suggests murderous intent. This argument, however, confuses the meaning of "deadly weapon" with "weapon specifically designed to cause death." A deadly weapon need not be "manufactured for the special purpose of taking a life." *People v. Carter*, 410 Ill. 462, 465 (1951). Rather, it is merely an "instrument that is used or

may be used for the purpose of an offense and is capable of producing death." *Id*. "Some weapons are deadly *per se*; others, owing to the manner in which they are used, become deadly. A gun, pistol, or dirk-knife is itself deadly, while a small pocket knife, a cane, a riding whip, a club or baseball bat may be so used as to become a deadly weapon." *People v. Dwyer*, 324 Ill. 363, 364-65 (1927).

¶ 14    Here, defendant brought this knife down upon his victim approximately 20 times. The result was multiple puncture and slash wounds to the victim's head, face, arms, and torso. Two of these wounds required surgical intervention and would have been fatal if not treated. Had the defendant nicked an artery, the attack could easily have been fatal. Considering that the difference between life and death here came down to a combination of chance, and prompt medical treatment, we are satisfied that a rational jury could conclude that defendant wielded his paring knife as a deadly weapon.

¶ 15    We are also satisfied that a rational jury could have looked at the crime's characteristics and concluded that defendant meant to kill his victim. Over the course of roughly 24 seconds, defendant swung down upon his victim approximately 20 times. The victim's wounds were not limited to his extremities, nor were they the result of simple slashing. Rather, multiple puncture wounds riddled the victim's torso and head area. A person whose object is merely to injure does not stab in a frenzy near his victim's vital organs. It is for this same reason that we reject the notion that defendant meant only to hurt his victim in retaliation for the latter's taunting. If defendant meant only to hurt his victim, he could have punched him, kicked him, or even *slashed* at him with his knife. Instead, defendant stabbed him at least 11 times across his body. The fact finder concluded that this behavior suggested a desire to end the victim's life. This conclusion is reasonable, and we will not disturb it.

¶ 16                    B. Whether Defendant's Sentence Was Excessive

¶ 17    Penalties are determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art I, § 11. In imposing a sentence, the trial court has broad discretionary powers. *People v. Fern*, 189 Ill.2d 48, 53 (1999). A trial judge is in a better position to observe such factors as a defendant's "credibility, demeanor, general moral character, mentality, social environments, and age," and thus is in a far superior position than an appellate court to fashion an appropriate sentence. *People v. Streit*, 142 Ill.2d 13, 19 (1991). However, the trial court's discretion is not unlimited; and the appellate court may alter a sentence if an abuse of discretion has occurred. *Id*. Nonetheless, a reviewing court "should proceed with great caution and circumspection" when reviewing a sentence imposed by the trial court, and it must not substitute its judgment for that of the sentencing court merely because it would have weighed the factors differently. *People v. Harper*, 50 Ill.2d 296, 301 (1972), *People v. Pittman*, 93 Ill.2d 169, 178 (1982).

¶ 18    Before sending a defendant to prison, the trial court must weigh the aggravating and mitigating factors contained under 730 ILCS 5/5-5-3.1 and 730 ILCS 5/5-5-3.2. Of these factors, the State identified in aggravation (1) that defendant's conduct caused serious harm; (2) that he had an extensive criminal history; (3) the age of the victim; and (4) that the crime took place on public transportation. In response, the defense presented in mitigation (1) that defendant acted under strong provocation; (2) that he had led a law-abiding life for a substantial period of time prior to the present offense; and (3) that his conduct was the result of circumstances unlikely to recur. The statutory range for attempted murder, a class X felony, is 6 to 30 years. The trial court weighed the above factors and sentenced defendant to 16 years in prison, to be served at 85

percent, with credit for time served from October 22, 2021. Having reviewed the record, we conclude that the trial court did not abuse its discretion.

¶ 19    When considering the mitigating factors, the trial court explicitly found that defendant committed the crime under strong provocation. However, the trial court declined to find that the crime occurred under circumstances unlikely to reoccur, nor that defendant had been law-abiding for a substantial period prior to the crime. While the exact circumstances of the crime, the trial court observed, would not likely reoccur, it was "very possibl[e]" that somebody would "provoke" defendant again "in any number of other ways," which may trigger violence in defendant. Regarding defendant's supposedly law-abiding habits, the trial court noted defendant's criminal record, which included charges a mere two years prior to the present case, for which defendant failed to appear in court. Further, defendant was convicted in 2012 for violating an order of protection, in 2016 for criminal trespass to property, and was charged in 2016 for criminal trespass to land, for which he also failed to appear. Defendant's history of "criminality and violating court orders," the trial court determined, precluded a finding that he had led a law-abiding life.

¶ 20    As aggravation, the trial court considered this same criminal history, as well as reports of defendant's aggressive and oppositional behavior while held at the Lake County jail. This behavior included his refusal to submit to a TB test, as well as his possession of a sharpened headphone jack, allegedly for use as a weapon. Defendant's behavior while in jail, combined with his criminal history, suggested an "aggressive, oppositional personality" and a generally "unreliable" disposition. The crime itself, meanwhile, was "relatively vicious" and occurred in a public place. Overall, the trial court's review of the sentencing factors was relatively meticulous, and gave both parties' arguments appropriate consideration.

¶ 21 Nonetheless, defendant urges us to overturn the trial court's sentencing decision as an abuse of discretion. In doing so, defendant excuses his criminal history as "indicative of homelessness," notes that defendant had no convictions for violent crimes, and points to Margaret Johnson's mitigation testimony as belying the trial court's conclusion that defendant possesses an "aggressive, oppositional personality." We do not reach the merits of these arguments. They represent an attempt by defendant to re-litigate sentencing issues properly decided by the trial court. Reversing the trial court on any of the above bases would amount to substituting the trial court's judgment for our own. We may not do this. *Pittman*, 93 Ill.2d at 178.

¶ 22 Finally, we briefly address defense counsel's suggestion that the trial judge's sentencing decision may have been rooted in his "implicit bias" against defendant, a black man. Counsel raises this argument for the first time on appeal. Accordingly, we deem this argument waived, and do not reach its merits. *People v. Enoch*, 122 Ill.2d 176, 186 (1988). We caution defense counsel, however, that responsible attorneys do not level these sorts of accusations lightly, especially when, as here, the record suggests zero impropriety on the part of the trial judge. Our system is one grounded in facts. We do not entertain broad generalizations based on race, whether the target of the generalization is a defendant, a judge, or anybody in between; to do so would be to betray our position as neutral arbiters of the law.

¶ 23                                   III. CONCLUSION

¶ 24 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 25 Affirmed.